Cedric GRADY, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2009–SC–000205–MR.

Supreme Court of Kentucky.

Nov. 18, 2010.

Samuel N. Potter, Department of Public Advocacy, Assistant Public Advocate, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Christian Kenneth Ray Miller, Assistant Attorney General, Office of the Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

Cedric Grady, Appellant, was convicted in Jefferson Circuit Court on two counts of first-degree robbery, one count of second-degree assault, one count of theft by unlawful taking over three hundred dollars, one count of second-degree burglary, two counts of first-degree wanton endangerment, one count of first-degree fleeing or evading the police, one count of first-degree unlawful imprisonment, and found to be a first-degree persistent felony offender. He was sentenced to seventy years' imprisonment and now appeals his conviction as a matter of right. Ky. Const. § 110(2)(b). For reasons explained below we reverse his conviction and remand for a new trial.

## I. Background

Around 6:00 a.m. on October 22, 2006, Paul Criswell was retrieving his car from the parking lot of the hotel where he was staying, preparing to leave Louisville, Kentucky. As he backed out of his parking spot, a man wearing panty hose over his face and brandishing a handgun approached his driver's side window. When the man demanded Criswell's money and vehicle, Criswell gave him the cash he had, but refused to turn over the vehicle, revealing to the perpetrator that he had a badge.[1] The perpetrator then fired the handgun, but the gun seemingly malfunctioned. Criswell, being six feet, five inches in height and around three hundred pounds, attacked the would-be robber, testifying that he tackled him like an "NFL special teams player." Understandably, fisticuffs ensued.

Criswell asserts that, during the scuffle, he was able to tear the stocking from the robber's face, and get a good look at him. Once the fight subsided, Criswell called 911, at which time he realized that he had been shot in the chest.

Detective Kenneth Brown of the Louisville Metro Police Department responded to Criswell's call. After arriving at the scene, he obtained a description from Criswell, who described his attacker as an African–American male, approximately five feet, seven inches tall and weighing approximately one hundred seventy pounds. While Criswell testified that he told Detective Brown that he could see his attacker's face and that he tore the stocking from his head, Detective Brown could not recollect Criswell's statement to that effect. Brown was unable to apprehend the described suspect.

Two days later, on October 24, around 6:00 p.m., April Stivers was sitting outside the Check–Into–Cash store, located on the same street as Criswell's hotel. Stivers, an employee at Check–Into–Cash, was taking a smoke break when she noticed a man dressed in dark clothing exit a white Chevrolet Trailblazer that had been parked near Check–Into–Cash "all day." She testified that she specifically remembered the vehicle, finding it noticeable because it did not have a license plate. Stivers testified that the man that approached her, postured as if he was reaching for something concealed on his person, and threatened to shoot her if she said anything.

After threatening her, the man proceeded into the Check–Into–Cash store. Other witnesses testified that he entered the store masked, clothed in a hooded sweatshirt with dark pants, and that he was slumped over with a visible gun in his right hand. He pointed the weapon at the cashier, demanded money, and exited the store fleeing in the white Trailblazer. The manager then called 911.

Sergeant Steve Smith responded to the 911 call and began to search the area for the assailant. He located a white Trailblazer parked in a lot a half mile away from Check–Into–Cash. Since the vehicle matched the description, he decided to examine its license plate to see if there were any signs that it had been recently removed. Noticing smudges around the plate, Smith waited for the vehicle's driver. Thereafter, Appellant exited a nearby office and got into the suspect vehicle.

Smith called for back up and followed the Trailblazer. When Officer White arrived on the scene, he activated his lights and siren, and a high-speed car chase ensued. The driver managed to evade the police, but wrecked in a nearby parking lot, fleeing the vehicle before the officers arrived. Upon discovering the wrecked

---

1. Criswell is a retired Captain from the Virginia Beach Fire Department.

Trailblazer, the officers began to search for its occupants.

During their search, the officers spoke with several witnesses, including Carlos Sanchez, Carlos Mojika, and Randy Rapp, all tenants of the apartment complex near the wreck. While the officers were unable to communicate with Sanchez and Mojika, as the two did not speak English, they were able to communicate with Rapp. These three witnesses did not testify at trial.

Shortly after police arrived, Rapp had run out of his apartment excitedly wielding a butcher knife. After officers instructed him to drop the weapon, Rapp advised the officers that a man had come into his apartment, stated that the police were looking for him, and that he needed a place to hide. The officers then entered Rapp's apartment, but did not find the suspect. The officers then went around the building and found Appellant lying in a fetal position behind an air conditioning unit below the open rear window of Rapp's apartment. The officers then arrested Appellant.

Vickie Wheeler, the landlord of the apartments, witnessed the incident and came to speak with her tenants about the situation. Rapp told Wheeler that an African–American male had broken through the front door of his apartment in an attempt to hide from police. Rapp further told Wheeler that the man would not let him leave until Rapp threatened the intruder with a knife. Wheeler also spoke to Sanchez who informed her that someone had tried to break down his doorframe, but was unable to get inside his apartment.

Thereafter, Appellant was transported to the Louisville Metro Police Department where Detective Dwane Colebank questioned him. Colebank testified at both the suppression hearing, and at trial, that he informed Appellant of his *Miranda* rights and that Appellant provided an oral waiver, but refused to sign a written waiver or to allow any type of video recordation. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also stated that Appellant confessed to robbing the store, but denied having a handgun. Additionally, he said Appellant stated that the Trailblazer belonged to his wife, Alicia Woolridge, and that he had taken it without her permission.

Appellant denies waiving his *Miranda* rights, asserts that he specifically requested an attorney and that he told Colebank that he did not want to answer any questions. He also asserts that he did not confess to robbing the store and that Colebank's testimony was wholly false.

Appellant was indicted in 2007 and 2008 for fifteen counts of various crimes. A trial was held in November 2008, and Appellant was convicted and sentenced as mentioned above.

This appeal followed and Appellant now asks this Court to address the following alleged errors: (1) whether the trial court erred by not holding a *Faretta* hearing when Appellant invoked his right to self-representation; (2) whether the trial court erred by not granting Appellant's request for a new lawyer; (3) whether the trial court erred by not allowing Appellant to testify during a suppression hearing addressing his alleged confession and whether there was error in failing to sustain Appellant's motion to suppress; (4) whether the trial court erred in allowing Criswell to make an in-court identification during the trial; (5) whether the trial court erred by admitting the hearsay statements of Sanchez and Rapp via Wheeler and whether palpable error resulted from the admission of hearsay statements made by Sanchez and Rapp via Officers White and Miller; (6) whether the trial court erred

by denying Appellant's motion for a directed verdict for insufficiency of the evidence; (7) whether the trial court erred in requiring him to wear a StunTech React Belt during the trial; and (8) whether cumulative error created a trial so fundamentally unfair as to require reversal.

## II. ANALYSIS

### A. *Faretta*

We first address Appellant's assertion that the trial court committed reversible error by not ensuring that he knowingly, intelligently, and voluntarily waived his right to counsel as required by a plethora of jurisprudence. *See Iowa v. Tovar*, 541 U.S. 77, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004); *McKaskle v. Wiggins*, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Depp v. Commonwealth*, 278 S.W.3d 615 (Ky. 2009); *Commonwealth v. Terry*, 295 S.W.3d 819 (Ky.2009). In support of his position, Appellant asserts that a *Faretta* hearing was not conducted and that in the absence of a finding that Appellant proceeded pro se with "eyes open," the conviction should not stand. *Tovar*, 541 U.S. at 88, 124 S.Ct. 1379 (*citing Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).

In response, the Commonwealth argues that Appellant is highly experienced with the criminal justice system and that his competency evaluations at the KCPC demonstrate his proficient level of knowledge with regard to the judicial processes of this Commonwealth and the federal system alike. The Commonwealth buttresses its argument by citing specific legal performances of Appellant such as filing a writ of habeas corpus, instituting a federal lawsuit against his appointed counsel and the Jefferson County Public Defender's Office, and arguing preservation issues before the Jefferson Circuit Court. The Commonwealth also relies on Appellant's prior convictions and individual experiences in the criminal justice system.

In the alternative, the Commonwealth asserts that the trial court held a hearing to determine, among other things, whether Appellant could represent himself, and thus argues that a *Faretta* hearing was completed. Yet in that same vein, the Commonwealth acknowledges that none of the questions recommended by this Court in *Terry*, 295 S.W.3d at 824, were asked of Appellant. Instead, relying on our holding in *Depp*, 278 S.W.3d at 620, the Commonwealth concludes that, in light of Appellant's legal abilities and the totality of the circumstances, the trial court implicitly found that Appellant had knowingly, intelligently, and voluntarily waived his right to counsel at a *Faretta* hearing. We cannot agree and, therefore, reverse.

■ The Sixth Amendment of the United States Constitution and Section Eleven of the Kentucky Constitution provide a defendant with the right to counsel. However, this Court and our federal counterpart have recognized that neither constitution prohibits the defendant from waiving this right. *See Tovar*, 541 U.S. 77, 124 S.Ct. 1379; *Faretta*, 422 U.S. 806, 95 S.Ct. 2525; *Depp*, 278 S.W.3d 615; *Terry*, 295 S.W.3d 819. However, when a defendant exercises his right to waive the assistance of counsel, *Faretta* advisory obligations are triggered and a trial court must ensure that the defendant makes his waiver knowingly, intelligently, and voluntarily. *Depp*, 278 S.W.3d at 617 (*citing Hill v. Commonwealth*, 125 S.W.3d 221 (Ky.2004)). The *Faretta* advisory obligations are likewise activated when a defendant invokes his right to hybrid counsel. *Wake v. Barker*, 514 S.W.2d 692, 697 (Ky.1974). In circumstances involving

sole or hybrid pro se representation, the right to be warned of the general dangers that one will face when choosing to proceed pro se is a separate and independent right that accompanies the right to represent oneself in front of his jury in any manner. *See Depp,* 278 S.W.3d at 618 (where we recognized "that [the right to self-representation is] accompanied by the right to be informed by the trial court of the dangers inherent in doing so."); *See also Wake,* 514 S.W.2d at 697 (where we recognized a defendant's right to limited assistance of counsel per Section Eleven of the Kentucky Constitution). Thus, a trial court may honor a defendant's right to self-representation, but may then violate the defendant's right to be informed of the general *dangers* by failing to take the requisite steps mandated by *Tovar, Faretta,* and *Depp.*

The actions required of a trial court addressing a defendant's waiver of counsel, however, are not rigidly defined. In fact, as a result of the United States Supreme Court's holding in *Tovar,* 541 U.S. at 90, 124 S.Ct. 1379, this Court abandoned the brightline approach we embraced in *Hill,* reasoning that its strict requirements were antithetical to judicial economy and common sense. *Depp,* 278 S.W.3d at 618–19. Indeed, we supplanted *Hill*'s inflexible requirements with a pragmatic approach whereby we simply question on appeal, in light of the entire record and on a case-by-case basis, whether the defendant's waiver of counsel was done knowingly, intelligently, and voluntarily. *Terry,* 295 S.W.3d at 820. Notwithstanding our abrogation of *Hill*'s rigid approach, we have maintained and recognized that there are certain minimal determinations required of a court that faces an invocation of *Faretta. See Depp,* 278 S.W.3d at 619 (where we acknowledged that the United States Supreme Court requires constitutional minimums for determining whether a waiver is knowing and intelligent).

■■■ In particular, we noted in *Terry* that the trial court must ensure that the defendant is proceeding with "eyes open," and to do so "he must be warned *specifically* of the hazards ahead" and of the possible consequences of a decision to forgo the aid of counsel. *See Terry,* 295 S.W.3d at 822 (*quoting Tovar,* 541 U.S. at 88, 124 S.Ct. 1379) (emphasis added). Implicit in this determination of whether a defendant is proceeding with eyes open is the requirement that the court hold a *Faretta* hearing, as such a determination can rarely be made in passing or without consideration of case-specific factors such as the defendant's education, experiences, sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding. *Depp,* 278 S.W.3d at 617 (*quoting Tovar,* 541 U.S. at 88, 124 S.Ct. 1379). To do less will result in structural error and will merit appellate correction. *See Hill,* 125 S.W.3d at 229 (*citing Faretta, supra* ). *See also McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). More importantly, a finding that the defendant is proceeding with eyes open cannot be made without sufficiently advising him of the dangerous grounds he asks to tread. Only when the defendant has been warned may a court determine that he proceeds with knowledge, intelligence, and of his own volition. But, again, we reiterate that a *Faretta* hearing, while required when a defendant invokes his *Faretta* rights, does not mandate that a court follow a script or employ magic words, but it does necessitate a finding that the defendant is proceeding with "eyes open"—that he gets a general warning of the dangers.

■■ In this instance, the Commonwealth's argument that the defendant waived his right to counsel with eyes open

is unpersuasive. In *Depp*, we discarded the rigid, scripted approach that required a trial court to make a formal finding of knowledge, intelligence, and volition in so many words, and, instead, found that where a trial court warns a defendant of the dangers he faces and makes a simple determination that a defendant can represent himself, the decision will stand where the record supports that finding. However, our decision was based on a record different from that presented here. The record in *Depp*, in fact, included a *Faretta* hearing where that appellant was specifically warned of the dangers of self-representation. 278 S.W.3d at 618. We do not have that here.

Here the record reveals that the trial court failed to warn Appellant of the general dangers in proceeding pro se or in a hybrid fashion. Appellant indeed proceeded in a hybrid fashion with no substantive warnings given at all, only colloquialisms that we find completely insufficient to satisfy the minimal requirement that a defendant be warned of the dangers he faces by invoking his *Faretta* rights.[2] The court's advice to Appellant that it was "game day" and that he should "get [his] cleats on, [his] jersey on, and get on the field" are inadequate to satisfy *Faretta*. More is required.

The court did at one point inform Appellant that "this is a big thing for you," but did not make the statement in an attempt to warn him of what he was facing, but only to warn him of the procedure he would be required to use at trial and in the context of advising him not to allude to the jury that he was presently incarcerated. In any event, should that statement be construed as a warning regarding the dangers Appellant was facing by proceeding pro se, we conclude that it was not enough. Thus, because Appellant received no general warnings with regard to the dangers of proceeding pro se, we cannot agree that he proceeded with eyes open, with knowledge, intelligence and of his own volition.

■ Adequate warnings must be given and we thus hold that a trial court cannot implicitly conclude that a defendant is aware of the dangers in proceeding pro se or with hybrid counsel without specifically complying with the described minimal requirements found in *Hill* and *Tovar*. We therefore reverse Appellant's conviction and remand this matter to the trial court for further proceedings consistent with this opinion.

Having found cause for reversal, we will consider such other issues as may call for dismissal or are capable of repetition on remand.

## B. Replacement of Counsel

We next turn to Appellant's assertion that the trial court erred when it refused to disqualify and remove the public defender assigned to his case. We address this issue because it may resurface on remand.

Appellant argues that the trial court committed reversible error by not appointing new counsel when so asked by Appellant. He urges that as a result of a complete breakdown of communication between himself and his appointed counsel, he deserved a new lawyer. In support of his appeal, Appellant first directs our at-

**2.** Although not before this Court on appeal, we pause to note that the trial court violated Appellant's right to represent himself pro se—without hybrid representation—when it unequivocally stated "I'm not gonna let you represent yourself." VR No. 6:11/05/08. In the event the issue is again presented on retrial, the trial court is admonished to consider its decision to allow Appellant to proceed alone, if that is truly his request, in light of our jurisprudence on the subject.

tention to a dispute that was addressed by the trial court during a pre-trial conference on May 24, 2007. That dispute concerned whether Appellant would undergo a criminal responsibility evaluation—an argument that Appellant claims was the seminal event leading to a complete breakdown of communication between himself and his appointed counsel. He further argues that the relationship continued to erode during the suppression hearing of April 10, 2008, where he insisted that he be allowed to testify and was allegedly not allowed.

Appellant also directs us to the complaints he made during a pretrial conference on May 28, 2008, where he alleged that his attorney was not providing him access to certain discovery items and where he complained to the judge that the two were not "agreeing on things." In addition to these specific instances, Appellant posits that by filing a bar complaint and by filing a civil suit against his appointed counsel in the United States District Court for the Western District of Kentucky, a conflict between himself and his public defender resulted, giving rise to good cause for substitution.

The Commonwealth responds by asserting that the trial court sufficiently handled the dispute concerning the criminal responsibility evaluation by admonishing Appellant to discuss the situation with his attorney. And because the criminal responsibility evaluation was subsequently conducted following Appellant's complaints, the Commonwealth concludes that the trial court properly resolved the dispute between the appointed counsel and Appellant and therefore no good cause to replace the public defender was merited.

With regard to the alleged breakdown that occurred when Appellant complained that his appointed counsel refused to permit him access to certain discovery, the Commonwealth again argues that the court below sufficiently addressed the issue as evidenced by the trial court's resolution, which ultimately garnered Appellant's access to the requested materials. Again, because Appellant was eventually granted his request, the Commonwealth argues that no good cause for substitution existed and replacement of counsel was not required.

However, the Commonwealth fails to respond to Appellant's assertions that removal of his appointed counsel was merited, in part, because Appellant was refused the opportunity to testify at a suppression hearing. Nor does the Commonwealth respond to the potential conflict presented by Appellant's filing of the bar complaint and the federal civil suit against his public defender. These questions must be addressed.

We begin our analysis with the axiom that "[a]n indigent defendant is not entitled to the appointment of a particular attorney, and a defendant who has been appointed counsel is not entitled to have that counsel substituted unless adequate reasons are given." *Deno v. Commonwealth,* 177 S.W.3d 753, 759 (Ky.2005). Where an indigent defendant seeks to displace his appointed counsel, he carries the burden to demonstrate to the court that there exists "good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict." *Shegog v. Commonwealth,* 142 S.W.3d 101, 105 (Ky.2004). We further described good cause as: "(1) a complete breakdown of communications between counsel and defendant; (2) a conflict of interest; and (3) where the legitimate interests of the defendant are being prejudiced." *Deno,* 177 S.W.3d at 759 (*citing Baker v. Commonwealth,* 574 S.W.2d 325, 326–27 (Ky.App. 1978)). And while we recognize that a bar complaint and a lawsuit filed by an indi-

gent defendant may give rise to good cause for replacement of appointed counsel, we have never held that either of these filings warrants an automatic substitution of an assigned public defender and we decline to do so today. *See Shegog,* 142 S.W.3d at 105–06.

■ Here, with respect to the disputes regarding the criminal responsibility evaluation, and the request to view specific evidence, we find that neither incident gives rise to good cause so as to merit the displacement of appointed counsel. In each instance the dispute between the public defender and Appellant was resolved and Appellant *was* successful in his requests for a criminal competency evaluation and a viewing of the discovery. In essence, Appellant communicated his displeasure to his appointed lawyer and thereafter his counsel, with the assistance of the court, acquiesced. There was no breakdown in communication and no conflict arose from this dispute. And because Appellant was successful in accessing the information he requested, we cannot say that his interests were prejudiced. These instances do not give rise to a situation that merits replacement of appointed counsel.

However, the allegation that appointed counsel prevented Appellant from testifying at the suppression hearing gives this Court reason to pause. To refuse Appellant's right to provide evidence in the form of his testimony at the suppression hearing was error as we discuss below. Yet, after a review of the record, we believe that appointed counsel was not at fault. In fact, a review of the suppression hearing clearly demonstrates that appointed counsel unequivocally announced to the court that Appellant wanted to testify and that he was therefore calling him to the stand.

Again, as with the above disputes, appointed counsel in this case disagreed with Appellant when he decided to testify at the suppression hearing dated April 10, 2008, but eventually acquiesced to Appellant's request. Nevertheless, the record reveals that Appellant did not testify and indeed was prevented from doing so. Notably, however, the barrier preventing Appellant from testifying was not erected by his appointed lawyer, but was the result of the trial court's decision. Thus, we cannot say that this error created a breakdown in communication between Appellant and his attorney in this case. Neither did it create a conflict of interest.

Being prevented from testifying at the suppression hearing may, conversely, have prejudiced Appellant's legitimate interest in putting forward evidence to rebut that presented by the Commonwealth. But we cannot fault appointed counsel as it was the court that refused to allow Appellant's testimony after the public defender expressly called Appellant to the stand. Thus, because it was not appointed counsel that refused Appellant his right to testify, no substitution of counsel was merited. That however is not to say that error did not occur when Appellant was prevented from taking the witness box—merely, that Appellant's counsel did not create it.

On remand, if Appellant insists upon testifying against advice of counsel, he may enhance or damage his case to the extent of his capabilities.

Finally, Appellant argues that by filing a bar complaint and by instituting a federal lawsuit against his appointed attorney and the Louisville—Jefferson County Public Defender Corporation, a conflict was created and, therefore, good cause was demonstrated meriting a substitution of counsel. We disagree.

■ At first blush, we note that when a defendant files a bar complaint or a civil lawsuit against his attorney, there would

seem to be an automatic conflict created. But we are guided in the opposite direction by the policy considerations addressed in *Shegog*, 142 S.W.3d 101. There, we reasoned that if we styled bar complaints as automatic conflicts, "trial delays due to counsel substitutions would be endless." *Id.* at 106. We find the same policy considerations appropriate where a defendant files a civil lawsuit against his appointed counsel, particularly where that lawsuit has been dismissed for failure to state a complaint upon which relief can be granted, as was the suit in this case. Indeed, at least one federal appellate court has likewise refused to find a conflict under nearly identical circumstances. *See Foote v. Del Papa*, 492 F.3d 1026, 1030 (9th Cir.2007) (where the Ninth Circuit, considering a defendant's federal habeas petition, approved the Nevada Supreme Court's finding that no conflict of interest arises from a dismissed federal lawsuit). Any contrary holding would give indigent defendants the ability to frivolously fire their appointed counsel simply by filing a civil lawsuit. As a result, a defendant could potentially force a trial court to grant countless motions to continue. We decline to arm defendants with the ability to create such per se conflicts. We are ever aware of defendants who seek to sabotage the trial process and we continue to be diligent in refusing to equip them with procedural avenues to evade the criminal justice system. To do otherwise would usurp our holding that defendants are not entitled to replace their counsel without good cause and would not serve the judicial economy of the courts of this Commonwealth. *Deno*, 177 S.W.3d at 759.

▬▬▬ We do, on the other hand, take this opportunity to note that where a trial court is faced with a legitimate bar complaint or a lawsuit that gives rise to meritorious allegations, a conflict of interest may indeed exist. We repeat that the existence of a conflict is to be determined on a case-by-case basis, and that no lawsuit or bar complaint automatically gives rise to a conflict. Notwithstanding our holding in this case, we note that trial courts should give such assertions as those presented today consideration when deciding the existence of a conflict of interest that might give rise to good cause for substitution of counsel. And so long as the trial court allows the defendant to state on the record the reasons why he seeks substitution of counsel, the trial court may exercise discretion to determine how extensive the hearing needs to be in light of the factual circumstances of each individual case.

Considering our discussion above, we find no error in the trial court's conclusion that no conflict resulted from Appellant's filing of a civil lawsuit and a bar complaint against his appointed lawyer. The record reveals that the trial court held a confidential hearing to entertain Appellant's assertion that a conflict existed. The court provided the requisite opportunity for Appellant to make his case for replacement of counsel on the record. In that hearing it was realized by the court and appointed counsel that the civil lawsuit was dismissed for failure to state a complaint upon which relief could be granted. *Grady v. Jefferson County Pub. Defender's Office*, No. CIV.A.3:08CV–P2–S, 2008 WL 3884319, at * 2 (W.D.Ky. Aug. 19, 2008). And while Appellant alleges that the dismissal was appealed to the United States Court of Appeals for the Sixth Circuit, he provided no information regarding the disposition of that appeal nor of the petition filed in that court.

▬▬ Likewise, Appellant provided no information regarding the bar complaint filed. We are therefore unable, from the record, to determine whether the bar com-

plaint filed by Appellant in this case gives rise to good cause meriting substitution of counsel. Appellant bears the burden to show such cause and he did not do so at the trial level and does not do so now. *United States v. Calabro,* 467 F.2d 973, 986 (2d Cir.1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973). *See also United States v. Welty,* 674 F.2d 185, 188 (3d Cir.1982); *Maynard v. Meachum,* 545 F.2d 273, 278 (1st Cir.1976); *United States v. Young,* 482 F.2d 993, 995 (5th Cir.1973).

### C. Suppression Hearing

■ As mentioned above, it was error for the trial court to prevent Appellant from testifying at his suppression hearing in April 2008. This assignment of error is the third issue raised by Appellant, and because it may re-appear on remand, we find it necessary to correct.

■ On February 27, 2008, Appellant moved the trial court to suppress his alleged confession, averring that it was not voluntarily made and procured in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602. At the hearing, held approximately six weeks later, the Commonwealth put forth evidence from Detective Colebank. Colebank testified that Appellant confessed to some of the crimes giving rise to this case. Subsequently, at the suppression hearing, Appellant made an unequivocal request to testify, doing so against the explicit advice of the court and of his counsel. However, he was prevented from taking the stand after the following exchange transpired:

Public Defender: Judge, from my conversation that we had off the record I believe it is Grady's decision to testify, you know I am not allowed to stand in anybody's way because what we have in the Constitution, I am reluctant to call him, but we will call him for the limited purpose of this hearing.

Court: Now—limited purpose of this hearing, he will be subject to cross-examination by the prosecutor.

Public Defender: I understand that.

Court: That info could be used.

Public Defender: I informed him of that judge.

Court: In this proceeding and in this trial could it not?

Public Defender: Yes, sir.

Court: So, it is a very serious thing you are doing here. I want to admonish you not to do this, you are making a record that could be used against you at your trial—do you understand?

Appellant: I understand completely You Honor—again, every time I try to talk, every time I try to get my issue out—and this is my situation we are dealing with nobody else's . . .

Court: You are being recorded right now.

Appellant: And I understand that sir, I understand that—but for the appellate situation that could be coming up behind this, I would like to get something on the record personally that I have to say, it is difficult to sit here, knowing that this gentleman is telling some things that are not true. It is difficult for me sit here as a condemned person and listen to someone tell a lie on me basically.

Public Defender: And I have tried to explain to Grady that you know when this thing eventually goes to trial, go ahead and testify, but I am scared that at this point and juncture we're at, I don't want to really give away what he is going to say and a chunk of what he's going to say today would probably come up at trial.

Appellant: Basically, all I am saying is this, Chuck, is that the Detective said I made a statement to him that I didn't make, period.

Court: Now, if you want to, think about the dynamics of what you're doing here. If you want to testify at this point, I'd have to swear you in, you'd be under oath, and you might see this, for example if you decide to testify at trial yourself to explain your side of the story, you might see something come up on this tape again in the way of cross examination trying to impeach you for what you said under oath here if it is inconsistent. And there may be some other things that you have to worry about. But you have a lawyer here whose counseled you against doing this. I think what you ought to do is talk to your lawyer about this and listen to what he's advising you to do. Because you might be playing into a bad strategy here. You understand? [3]

Appellant: I understand what you're saying completely, Your Honor. That's all I want to get on the record is that the man said I made a statement that I didn't make. Like you said ...

Court: If you want to contest this at trial, you know, if you want to testify at trial, that's something that you'll have to, you have a constitutional right to testify at trial, and if you want to explain that at trial, you're more than welcome to. But that's, that's a decision that you're going to have to make before the jury.

Appellant: I also have a right to *Miranda*, and I observed my *Miranda* rights and I didn't make a statement. I asked for an attorney and Detective Colebank kept me in his division ...

Court: Okay, now, look, I'm not going to let you give statements without being under oath. So I think as far as hearing any further from you on this issue, uh, we're going to close the hearing. I wanna hear any legal arguments why this statement should be suppressed.

As the record reveals, Appellant made an unequivocal request to testify, evidenced by his attorney's announcement that he was calling him to the stand. Furthermore, he twice made statements that he wanted to get certain information on the record and the trial court warned him that he would not be allowed to make any further statements without being under oath, but then denied him the chance. The error occurred when the trial court stated, "I think as far as hearing any further from you on this issue, uh, we're going to close the hearing." The judge closed the hearing, but apparently did so solely to Appellant. The court continued to consider the suppression motion in other respects by soliciting oral argument, subsequently stating, "I wanna hear any legal arguments why the statement should be suppressed." At that point, defense counsel noted that without calling Appellant to the stand, he had nothing to counter the testimony presented by the Commonwealth. Yet defense counsel insisted it was the right decision not to put Appellant in the

---

**3.** Even though this issue is not presented on appeal, we find it pertinent to point out that Appellant may testify in his own behalf at a suppression hearing without waiving the privilege against self-incrimination. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Furthermore, testimony at a suppression hearing may be confined on cross-examination to the scope of the di-

rect examination. *Shull v. Commonwealth*, 475 S.W.2d 469 (Ky.1971). And while his testimony may be used later for impeachment purposes, it may not otherwise be used against him unless he fails to object. *Adams v. Commonwealth*, No. 2009–SC–000296–MR, 2010 WL 2025104 (Ky. May 20, 2010); *Commonwealth v. Bertram*, 596 S.W.2d 379 (Ky. App.1980).

witness box. The court ultimately denied the motion to suppress the confession, finding the detective's testimony sufficient to support the waiver of *Miranda* and the voluntariness of the statements made. As a result, the confession was used at Appellant's trial.

■■■ Pursuant to RCr 9.78, a trial court must conduct an evidentiary hearing when a defendant files a motion to suppress a confession. At these hearings, the Commonwealth will bear the burden of demonstrating by a preponderance of the evidence supporting the voluntariness of the defendant's confession or incriminating statement, and the defendant is all the while entitled to introduce evidence to counter that offered by the Commonwealth. *Lewis v. Commonwealth,* 42 S.W.3d 605, 610 (Ky.2001) (*citing Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Tabor v. Commonwealth,* 613 S.W.2d 133, 135 (Ky. 1981)); *Commonwealth v. Jones,* 217 S.W.3d 190, 193 (Ky.2006); *See Mills v. Commonwealth,* 996 S.W.2d 473, 482 (Ky. 1999) (citations omitted) (noting that uncontradicted testimony by witnesses for the Commonwealth satisfied a burden of proof higher than preponderance of the evidence to show waiver). Ultimately, the court must enter into the record findings resolving the essential issues of fact. *Jones,* 217 S.W.3d at 193.

But, where error regarding these types of hearings is alleged on appeal, specifically where an evidentiary hearing is denied in some manner, we have held that reversal or remand is not automatically required. *Lewis,* 42 S.W.3d at 611 (*citing Procunier v. Atchley,* 400 U.S. 446, 451, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971)). In *Lewis v. Commonwealth,* we were persuaded by federal jurisprudence that required an appellant to show more than shortcomings in the procedures applied when he is de-nied an evidentiary hearing addressing the voluntariness of an alleged confession and adopted that approach. 42 S.W.3d at 611. Indeed, after *Lewis,* we have required an appellant to show "that his version of events, if true, would require the conclusion that his confession was involuntary", i.e., indicating the involuntariness of his confession. *Id.* (*quoting Procunier,* 400 U.S. at 451, 91 S.Ct. 485). Importantly, however, courts employing the *Procunier* standard of appellate review have also stated that the facts asserted in these instances must be more than "conclusory and wholly devoid of specifics." *Hoskins v. Vasquez,* 883 F.2d 1024, 1024 (9th Cir. 1989) (*citing Boehme v. Maxwell,* 423 F.2d 1056, 1058 (9th Cir.1970); *Bashor v. Risley,* 730 F.2d 1228, 1233 (9th Cir.1984)).

Yet our holding in *Lewis,* where we relied upon *Procunier,* addressed an evidentiary hearing concerning the voluntariness of a confession and not a situation regarding a *Miranda* violation. And, although argued in conglomeration by Appellant and rebutted in like manner by the Commonwealth, a *Miranda* violation issue and a voluntariness of confession issue are separate and distinct. In fact, we noted in *Mills,* that "[t]he question of whether a defendant has voluntarily waived his *Miranda* rights is analyzed somewhat differently than the question of whether the underlying confession is voluntary." 996 S.W.2d at 481.

The federal courts have likewise recognized this distinction and have held that the admission of a confession not obtained in violation of *Miranda* may still be inadmissible on grounds of involuntariness. *United States v. Murphy,* 763 F.2d 202, 205 (6th Cir.1985) (citations omitted). Thus, the question is presented whether our holding in *Lewis* controls a suppression hearing that concerns whether a con-

fession was procured in violation of *Miranda.*

■ We find no reason that the appellate standard should differ, and thus hold that an appellant will be entitled to reversal or remand only after he is, first, denied an opportunity to put forward evidence at a hearing addressing a *Miranda* violation and, second, where he alleges facts on appeal, that if believed to be true, would merit a finding that his confession was obtained in violation of *Miranda.* We note that even though a court analyzes a *Miranda* violation differently than it would a claim of involuntariness, both require the court to make findings of fact from evidence presented at an evidentiary hearing. Thus, we conclude that while the *analysis* used to determine a *Miranda* violation and a voluntariness issue differs, the *procedure* employed to make those determinations is the same, and we further hold that the appellate standard should likewise be similar.

Since Appellant was denied his right to testify at the April suppression hearing, we must now consider what he proffers that his testimony would have been to determine whether he is entitled to a new hearing on remand. We find that given the proffered testimony in this case, Appellant is so entitled.

## 1. Voluntariness

■ Appellant asserts in his brief that had he been allowed, he would have testified that: (1) the officer lied when he impugned certain statements onto Appellant; (2) that he did not waive his *Miranda* rights; (3) that he specifically invoked his right to an attorney; (4) that he was kept at the robbery office for eight hours; and (5) that he told Colebank that he did not want to answer any questions. Treating these statements as true, as we must on appeal, we now question whether

the trial court, had it believed the statements, would have concluded that the confession was involuntary.

■ When determining whether a confession is involuntary, a court must consider the totality of the circumstances and mull over case specific factors. Among specific factors considered by other courts, we find several particularly pertinent to this case including: the length of the interrogation, whether the defendant has been advised of his *Miranda* rights, whether the defendant has waived his *Miranda* rights, and whether he has invoked *Miranda* rights. *See Clark v. Murphy,* 331 F.3d 1062, 1073 (9th Cir.2003) (defendant's confession voluntary though he had been held and intermittently questioned in small room for eight hours), *cert. denied,* 540 U.S. 968, 124 S.Ct. 446, 157 L.Ed.2d 313 (2003); *Mincey v. Arizona,* 437 U.S. 385, 396–402, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (where suspect interrogated for four hours in intensive care unit, had tubes in his throat and nose, was heavily medicated, had been shot, and had not been afforded counsel despite explicit request for counsel, statements deemed involuntary); *Jenner v. Smith,* 982 F.2d 329, 334 (8th Cir.1993) (six or seven hour questioning not coercive), *cert. denied,* 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993); *United States v. Lehman,* 468 F.2d 93, 101 (7th Cir.1972) ("vigorous" eight hour questioning with few breaks did not render confession involuntary), *cert. denied,* 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972); *Darwin v. Connecticut,* 391 U.S. 346, 349, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968) (per curiam) (confession obtained during 48–hour interrogation of defendant who had been denied right to counsel deemed involuntary); *Greenwald v. Wisconsin,* 390 U.S. 519, 519–21, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) (per curiam) (confession obtained from defendant with ninth grade edu-

cation, who was questioned without *Miranda* warnings for over eighteen hours and was prevented from eating, sleeping, and taking his medication, deemed involuntary); *Clewis v. Texas*, 386 U.S. 707, 709–10, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967) (confession resulting from nine-day interrogation with inadequate food and sleep deemed involuntary); *Davis v. North Carolina*, 384 U.S. 737, 746–47, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) (confession resulting from questioning once or twice a day for approximately 45 minutes to an hour on each occasion, over 16–day period with inadequate food deemed voluntary).

But when considering the voluntariness of a confession a court must consider an issue more fundamental than the facts surrounding the manner in which the confession is procured; the judge must first determine whether that confession was made at all. It goes without saying that a non-existent confession cannot be used against a defendant at trial. Therefore, before a court can determine that a defendant voluntarily confessed, it must first believe that the defendant confessed in the first place. To do this, the court must hear the defendant's evidence. Only then may the court determine whether the defendant's confession was voluntary.

Here, Appellant asserts that he was held for eight hours at the robbery office, that he never waived his *Miranda* rights, that he invoked his right to an attorney, that he told Colebank he did not want to answer any questions, and that Colebank's testimony was wholly false. We find these assertions, if they were believed, sufficient to merit suppression. If the trial court had believed these statements, it would have had to conclude that Appellant did not confess and thus would have never reached the question of voluntariness. Of course, the truthfulness of Appellant's statements are findings solely determined by the trial courts—not this Court. RCr 9.78. Therefore, Appellant is entitled to a new consideration of this issue on remand.

## 2. Miranda

Our analysis of the alleged *Miranda* violation is similar to the voluntariness analysis in that we consider the testimony proffered by Appellant to determine whether he is entitled to a new suppression hearing. Where Appellant's proffered testimony, accepting it as true as we must on appellate review (since it was not received), would lead to the conclusion that his confession was procured in a manner violative of *Miranda,* he is entitled to a new hearing on remand. 384 U.S. 436, 86 S.Ct. 1602.

Thus, we again turn to the statements Appellant asserts he would have testified to, had he been given the opportunity. Again, Appellant asserts that he would have sworn under oath that he was held for eight hours at the police station, that he never waived his *Miranda* rights, that he invoked his right to an attorney, and that the Detective's testimony was wholly false.

If the trial court believed that Appellant invoked his right to an attorney, that he never waived any of his *Miranda* rights, that told Colebank that he did not want to answer any questions, and that Colebank's testimony was wholly false, then suppression of the alleged confession would be mandatory. In fact, we conclude, as we did with our voluntary analysis above, that had the judge believed Appellant, he would have had to conclude that Appellant never confessed in the first place and thus, the confession could not be used against him at trial. In the alternative, assuming the confession did occur, Appellant's other proffered testimony would have required suppression, if the trial court had believed it as true. Specifically, because Appellant

asserts that he invoked his right to an attorney, and because he asserts that he never waived any of his *Miranda* rights, the trial court, if it believed these statements as true, would have had to suppress the confession because it would have had to conclude that the confession was secured in violation of *Miranda*.

Thus, because Appellant's proffered testimony, if believed true, would force the conclusion that it was either non-existent or procured in violation of *Miranda*, he is entitled to a new suppression hearing on remand.

We take this opportunity to highlight the fact that we are not passing on whether suppression of the confession was merited in this case. In fact, the trial court may not have believed any of Appellant's assertions. However, Appellant was entitled to make those assertions at the suppression hearing and our precedent requires us, on appellate review, to consider the proffered testimony as true since it was never allowed. Thus, while we instruct the trial court to allow Appellant to put forward his testimony on remand (if he still desires to testify), we do not pass on the weight or credibility of that testimony; those determinations are for the trial court.

### 3. Correctness of the Suppression Ruling

Because Appellant is entitled to a new suppression hearing concerning the voluntariness and *Miranda* issues, we find Appellant's assertion that the confession should have been suppressed because the Commonwealth did not carry its burden at the suppression hearing moot. We therefore will not consider the merits of this argument.

### D. The In–Court Identification

We now address Appellant's claim that reversible error occurred when the trial court allowed Criswell to make an in-court identification of Appellant after Criswell allegedly viewed pre-trial line-up materials that the Commonwealth subsequently lost. Appellant asserts that facts surrounding this case lead to the conclusion that the in-court identification lacks sufficient reliability so as to be admissible.

The Commonwealth believes no error occurred and asks this Court to find that even though the Commonwealth lost the pre-trial line-up materials used in this case, those materials were not unduly suggestive, and thus no taint occurred. The Commonwealth further asserts that even if the pre-trial materials were unduly suggestive, the facts surrounding the identification support a finding that the in-court identification retained independent reliability and thus the in-court identification was admissible regardless of the suggestive nature of the (lost) pre-trial materials.

■■■■■■ Suggestive identifications deprive defendants of due process because they increase the likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). And ultimately, the admissibility of identification testimony spins on its reliability. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). A conundrum presents itself, however, when a defendant asserts that an out-of-court identification is made under unduly suggestive circumstances, and the materials used in that identification are lost. Such a circumstance, as we have here, makes the question of whether the unduly suggestive identification has tainted a subsequent in-court identification particularly difficult to resolve.

The United States Supreme Court has warned that an identification that is the

fruit of an unduly suggestive pre-trial identification deprives a defendant of the right of cross-examination, which is an essential safeguard to his right to confront witnesses against him. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). However, the Wade Court noted that a tainted identification may be overcome, recognizing the test it outlined in *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In *Wong Sun,* the Court stated that after the illegality of the initial identification is established, the question then turns on "the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* We have adopted this approach, and have explained that where it is shown that an identification has an independent basis of support, separate from the prior, tainted, out-of-court identification, it will be admissible regardless of the inappropriateness of the prior, first identification. *Francis v. Commonwealth,* 468 S.W.2d 287 (Ky.1971).

Thus, when a defendant alleges that an in-court identification has been tainted by a pre-trial identification, a court must answer two questions: (1) was the first, pre-trial identification unduly suggestive; (2) if the pre-trial identification was unduly suggestive, does there exist an independent basis to support the reliability of the in-court identification so that the unduly suggestiveness of the pre-trial identification becomes moot. *Savage v. Commonwealth,* 920 S.W.2d 512, 513 (Ky. 1995).

It goes without saying that when a trial court determines that the initial pre-trial line up is *not* unduly suggestive, the court need not move to the second test—where there is no prior taint, the in-court identification is reliable absent other issues. But when a court does determine that the pre-trial materials are unduly suggestive, it must then turn to the second prong of *Savage,* and determine whether there is an independent basis of support. To determine whether an independent basis of support exists, a court should consider the factors outlined in *Neil,* 409 U.S. at 198, 93 S.Ct. 375, which we adopted in *Savage,* 920 S.W.2d at 513. Those factors include: (1) witness's opportunity to view; (2) witness's degree of attention; (3) accuracy of prior descriptions; (4) level of certainty at confrontation; and (5) the time between the crime and the confrontation. *Id.* at 514. We have also allowed the admission of other evidence that tends to corroborate the witness's identification. *See St. Clair v. Commonwealth,* 140 S.W.3d 510, 551 (Ky.2004). With these guiding principles in mind, we turn to the case at bar.

The Commonwealth asserts that this case is controlled by our decision in *Shegog v. Commonwealth,* 142 S.W.3d 101 (Ky. 2004). In *Shegog,* we found no error when the trial court permitted a witness to make an in-court identification after that witness previously made an identification based on line-up materials that were subsequently lost. *Id.* at 106. Indeed, at first blush, that case would seem to be on all fours with this appeal. However, a closer review of *Shegog* reveals that the facts involved therein are quite distinguishable from those here. There, the parties put forward evidence regarding the lost line-up materials. *Id.* at 106. The officer who accumulated the photographs for the line-up and the identifying witness both testified as to the make-up of the line-up materials. *Id.* Moreover, the appellant in that case put forward assertions regarding the photo he thought was used in the line-up, namely one that had his name, height, weight and social security number. *Id.*

Furthermore, in *Shegog*, we found that the trial court made an appropriate determination of independent reliability (the second prong of *Savage*) to allow the in-court identification regardless of the possibility that the pre-trial lineup materials were unduly suggestive. *Id.* at 106–07. This case is different.

Here, the officer who allegedly put forward the line-up materials *does not remember* Criswell making the pre-trial identification. In fact, the only evidence presented to this Court regarding what materials were used in the out-of-court line-up is in the form of testimony from Criswell himself. Moreover, here, it is unclear whether the trial court ruled on the suggestive nature of the lost line-up materials and thus it is unclear as to whether he reached the second prong of the *Savage* analysis (the determination of independent basis of reliability.). Consequently, in this case, the precedential value of *Shegog* is limited.

■■■■ In any event, we find it necessary to address our decision in *Shegog*, particularly the extent to which it may be read to require a defendant to prove the suggestive nature of pre-trial lineup materials that are lost by the Commonwealth before they can be scrutinized by the defendant. We note that when a defendant asserts that a pre-trial line up has tainted a subsequent identification he carries the burden to show the unduly suggestiveness of the first pre-trial line up materials. Consequently, because we have laden the defendant with this burden, we find it unjust to say in the same breath that he must prove unduly suggestiveness when he does not have access to the line-up materials. To hold otherwise would be adverse to

justice and a defendant's ability to confront and question evidence that might have poisoned a subsequent identification would be severely curtailed. Accordingly, we hold that a rebuttable presumption is necessary: one that assumes that when materials used for a pre-trial lineup are lost before the defendant has an opportunity to scrutinize their content, those materials will be presumed to be unduly suggestive.[4] We find support from other state and federal courts addressing this issue. *See United States v. Sanchez*, 603 F.2d 381 (2d Cir.1979); *State v. Bauer*, 123 Wis.2d 444, 368 N.W.2d 59, 65–66 (1985), *rev'd on other grounds by State v. Bauer*, 127 Wis.2d 125, 377 N.W.2d 175 (1985).

However, as noted by the United States Supreme Court in *Neil*, 409 U.S. at 199, 93 S.Ct. 375, and in our decision in *Savage*, 920 S.W.2d at 513, simply because pretrial lineup materials are unduly suggestive does not mean that a subsequent in-court identification may never be made. In fact, under the second prong of *Savage*, the unduly suggestive nature of the pre-trial lineup becomes totally irrelevant if a court determines that there is an independent basis of reliability for the in-court identification; that determination being made after considering: (1) a witness's opportunity to view; (2) a witness's degree of attention; (3) the accuracy of prior descriptions; (4) the level of certainty at confrontation; (5) the time between the crime and the confrontation; and (6) other evidence that tends to corroborate the in court identification. Thus, we hold that even where the pre-trial line up materials are lost and our new presumption arises, a court may allow an in-court identification if there is an independent basis to support

---

4.  We note that there exist other, similar remedies where the Commonwealth loses evidence. *See Sanborn v. Commonwealth*, 754 S.W.2d 534 (Ky.1988) (abrogated on other grounds); *Estep v. Commonwealth*, 64 S.W.3d 805, 809–10 (Ky.2002); *Johnson v. Commonwealth*, 892 S.W.2d 558, 563–64 (Ky.1994).

the reliability of the in-court identification after considering the factors enumerated in the second prong of our *Savage* analysis.

Given this presumption and the fact that it is unclear whether the trial court reached the question of independent basis of reliability, we remand this issue to the trial court for further consideration consistent with this opinion. However, we find it necessary to reiterate that simply because lost line-up materials merit a rebuttable presumption that they are unduly suggestive does not necessitate a finding that the factors in the second prong of the *Savage* analysis, which provide an independent basis for the identification, have not been satisfied in this case. This is a matter for the trial court in the first instance.

### E. Hearsay

Appellant also asks this Court to find error in the trial court admission of certain hearsay testimony, urging a violation of the Confrontation Clause as addressed in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Specifically, Appellant argues that the trial court committed reversible error by admitting the statements of Vickie Wheeler, the landlord, who testified that her tenants told her that someone tried to break into their apartments and that Rapp said the intruder would not let him leave. Appellant objected at trial, properly preserving this issue for appeal. Appellant also urges, however, that the trial court committed error by allowing the testimony of Officers White and Miller regarding statements made by Sanchez and Rapp even though he failed to preserve these issues for appellate review. Therefore, Appellant asks this Court to exercise its authority under RCr 10.26 and find that the admis-

sion of the two officers' hearsay statements tantamount to palpable error.

The Commonwealth responds by noting that the statements were properly admitted and that the Confrontation Clause was not violated because all the statements admitted were non-testimonial. In the alternative, the Commonwealth asserts that no palpable error resulted and that if any error exists at all, it is harmless.

To review an error under the palpable error standard, we must find that a manifest injustice has resulted from an error not properly preserved for appeal. RCr 10.26. We also require a demonstration that a different outcome would have resulted at trial or evidence of an error so fundamental as to threaten a defendant's entitlement to due process of law. *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky. 2006). The burden to demonstrate palpable error is high, as a defendant must show that the error involved prejudice more egregious than that occurring in reversible error. *Brewer v. Commonwealth,* 206 S.W.3d 343, 350 (Ky.2006). Indeed we must make an ultimate finding that the error was shocking or jurisprudentially intolerant. *Martin,* 207 S.W.3d at 4. Thus, applying these rules, we question whether a manifest justice has occurred and conclude that it has not.

Because we reverse the conviction for reasons stated above, no manifest injustice has occurred to Appellant, and therefore a palpable error review is not merited. Accordingly, because Appellant did not preserve the correctness of the trial court's decision to admit Officer White's and Officer Miller's testimony, and because we find no manifest injustice, we decline to review that decision.

Conversely, Appellant did object to the hearsay put forward by Wheeler and properly appeals its admission. And because

this issue may recur on remand, we find it necessary to address it.

■ Appellant argues that by allowing Wheeler to testify to statements made by Sanchez and Rapp, the court ran awry of the Confrontation Clause of the Sixth Amendment of the United States Constitution. Relying on *Crawford* and *Davis*, Appellant urges us to find the statements testimonial and thus inadmissible under any hearsay exception. In support of his claim that the hearsay was indeed testimonial, Appellant argues that an objective observer would not conclude that there was an ongoing emergency at the time the statements were made by Rapp and Sanchez to their landlord, Wheeler and thus, under *Crawford* and *Davis*, the statements must have been testimonial. *Crawford*, 541 U.S. at 51–52, 124 S.Ct. 1354; *Davis*, 547 U.S. at 822, 126 S.Ct. 2266. Ultimately, Appellant asserts that he was denied the opportunity to cross-examine either Rapp or Sanchez, and was therefore denied his right to confront witnesses who effectively testified against him via Wheeler's testimony.

The Commonwealth responds by stressing the fact that these hearsay statements were made to a landlord, and not a state actor or member of law enforcement. Relying on our opinion in *Hartsfield v. Commonwealth*, where we flatly stated that "[t]he excited utterances at issue, made to lay witnesses, do not fit within the *Crawford* and *Davis* formulation of testimonial statements," the Commonwealth asks us to find no error and hold these statements as non-testimonial. *Hartsfield v. Commonwealth*, 277 S.W.3d 239, 245 (Ky.2009). We agree with the Commonwealth that these statements were non-testimonial, but for different reasons.

In *Crawford*, the Confrontation Clause of the United States Constitution was read to preclude statements of a witness unavailable to testify at trial if the witness's out-of-court statements were testimonial, unless the accused had a previous opportunity to cross-examine the witness. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. After *Crawford*, a court had to determine whether any hearsay statements used against an accused were testimonial, without the benefit of the Supreme Court's elaboration on the definition of testimonial.

In *Davis*, the Supreme Court provided further guidance on the definition of "testimonial," and held that:

> Statements are non-testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822, 126 S.Ct. 2266. The high Court went on to cite factors for a court to consider when determining whether a statement is testimonial, namely: (1) whether the events spoken about were actually happening, or were past events; (2) the presence of an ongoing emergency; (3) whether what was asked and answered was for the purpose of resolving the situation, rather than simply learning what had happened in the past; and (4) the level of formality in the interview. *Id.* at 827, 126 S.Ct. 2266. The Court also noted that a court examining the hearsay statements should consider the "primary purpose of the interrogation" and question "whether it is to establish or prove past events potentially relevant to later criminal prosecutions." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266.

Citing the first footnote in *Davis,* this Court has opined in dicta that "neither *Crawford* nor *Davis* limited testimonial statements to those obtained by law enforcement or their agents." *Rankins v. Commonwealth,* 237 S.W.3d 128, 131 (Ky. 2007) (*citing Davis,* 547 U.S. at 822, n. 1, 126 S.Ct. 2266). However, a perusal of *Davis* reveals that the Supreme Court deliberately refused to answer the question of whether statements obtained by laypersons could be testimonial. In fact, the next footnote reads verbatim:

> If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police. As in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), therefore, our holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are "testimonial."

*Davis,* 547 U.S. at 822, n. 2, 126 S.Ct. 2266. Thus, the question of whether *Crawford* and *Davis* apply to laypersons remains unanswered by the United States Supreme Court.

However, that question was squarely presented and seemingly decided by our decision in *Hartsfield.* Indeed, in *Hartsfield,* we found that the hearsay statements at issue "made to lay witnesses, do not fit within the *Crawford* and *Davis* formulation of testimonial statements," but we went on to apply the four factors outlined in *Davis. Hartsfield,* 277 S.W.3d at 245.

In *Hartsfield,* a rape victim made statements to a passerby immediately after she suffered the crime. *Id.* at 242. She then went to her daughter's house and made more statements regarding the crime. *Id.* Applying the above mentioned factors, we found both statements, made to the passerby and to the daughter, admissible because, "[t]hese statements in the case at hand were spontaneous and unprompted by questioning. These statements were not testimonial because they were not formal, not delivered to law enforcement or its equivalent, and were in the nature of seeking help for an emergency (even though it was not ongoing)." *Id.* at 245.

We believe *Hartsfield* is controlling in this case, and again find that the statements considered here are non-testimonial given the surrounding circumstances.

Here, Wheeler testified that she spoke with her tenants to check for "any damage" and to see if her tenants "were okay." Importantly, like *Hartsfield,* the statements were made within minutes (approximately three or four minutes) after the event transpired. Wheeler stated that at the time she spoke with Rapp and that he was a "nervous wreck" and that Sanchez was so distraught that he was speaking in both English and Spanish. These statements were informal as they were not obtained by a trained interrogator and neither were they taken under interrogative circumstance.

Like *Hartsfield,* these statements were not made to law enforcement or their equivalents. They were informal and were not obtained under interrogative circumstances. Furthermore, we conclude that the emergency was not ongoing, Appellant had been arrested at the time the statements were made. However, even though the emergency was not ongoing (and neither was an emergency ongoing in *Hartsfield* ) we conclude that the statements were solicited by Wheeler out of concern for her property and her tenants wellbeing rather than from a desire to retrieve testimony that may be used against Appellant

at trial. As a result, we cannot say that an objective observer would consider the primary purpose of the solicitation was for the purposes of a future prosecution. *Davis*, 547 U.S. at 822, 126 S.Ct. 2266 (where the Court examined the "primary purpose" of the questioner).

Thus, as in *Hartsfield*, we find that the statements made to a layperson in this case, do not fit within the ambit of *Crawford* and *Davis*.[5]

### F. Sufficiency of Evidence

■ Appellant also argues that no competent evidence[6] was put forward to justify a finding of guilt on the second-degree burglary charge and on the count of unlawful imprisonment. Relying on the premise that the above mentioned hearsay testimony should have been excluded, Appellant asserts that the Commonwealth has failed to meet its burden.

The Commonwealth rebuffs this argument and asserts that the hearsay evidence was non-testimonial. In the alternative, the Commonwealth posits that other evidence exists to support a guilty verdict. The Commonwealth is correct.

■ When a trial court is moved to enter a directed verdict, it must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). Where the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should be refused. *Id.* On appeal, a court should consider the evidence as a whole, and question whether it was clearly unreasonable for a jury to find guilt. *Id.* Furthermore, an appellate court should consider "the same evidence considered by the trial court, rightfully or wrongfully." *Burton v. Commonwealth*, 300 S.W.3d 126, 144 (Ky.2009). We now look at the evidence supplied to the trial court to determine whether it was sufficient to survive a directed verdict.

Appellant's argument that without the admission of the hearsay statements no competent evidence was presented to support a finding of guilt, is effectively eviscerated by our conclusion that no error has been demonstrated regarding the hearsay statements admitted by the trial court. However, even if we considered those hearsay statements inadmissible, we are bound to consider them when weighing whether there was sufficient evidence to survive a motion for directed verdict because the statements were admitted as competent evidence by the trial court and introduced to the jury as evidence of guilt. *Id.* Applying this rule, we find the hearsay statements enough to defeat a directed verdict as they directly implicate Appellant. Thus, we consider Appellant's argument unpersuasive. A directed verdict was not merited in this case.

### G. StunTech React Belt System

Appellant also seeks reversal of the trial court's decision requiring Appellant to con-

---

**5.** We note that the Commonwealth zealously attempts to justify the hearsay exception used to admit the landlord's statements at trial. However, Appellant only appeals whether the statements were testimonial and controlled by *Crawford* and *Davis* and does not argue that any hearsay exception was undeserved. Therefore, we find that the issue of whether a hearsay exception merited the admission of these statements not properly before us and thus, we do not address the correctness of this argument.

**6.** Reversal and remand is already commanded in this case, and Appellant is entitled to a new trial. However, because Appellant asks us to find that there exists insufficient evidence to convict him on the burglary and unlawful imprisonment charges, a finding that would bar a re-trial on these issues, we find it imperative to consider these issues.

duct his entire trial while wearing a Stun-Tech React Belt System, a security restraint that he alleges was identifiable to the jury. Appellant concludes that because the jury was able to see the restraint, he lost his presumption of innocence, and thus his right to a fair trial.

The Commonwealth counters that the brace was not apparent to the jury and that if it was, the jury would merely have concluded that it was a medical brace, or would have not known what it was. They argue in the alternative, that it was harmless error to require Appellant to wear the device.

■■■■■■ We begin by noting that we are provided with no findings from the trial court on whether the restraint was visible to the jury. We therefore are unable to make a determination as to the correctness of the court's order. In any event, we instruct the trial court on remand, should the issue resurface, to determine the visibility of the device and the likelihood that it will be apparent to the jury. In the event the court finds the device will be apparent, the court should determine on the record the reasons supporting the use of the restraint. We find support for our reasoning in the language of RCr 8.28(5), which controls the use of shackles and restraints. It reads:

> During his or her appearance in court before a jury the defendant shall not be required to wear the distinctive clothing of a prisoner. Except for good cause shown the judge shall not permit the defendant to be seen by the jury in shackles or other devices for physical restraint.

RCr 8.28(5). Here, as is obvious, RCr 8.28(5) concerns not whether a restraint or shackles may be used, but only their visibility. Only where good cause is shown may the court permit the defendant to be *seen* by the jury in shackles or other de-vices found necessary for physical restraint. Thus, we conclude that RCr 8.28(5) is not implicated where the jury cannot see the restraining device. Indeed where a restraint cannot be *seen* (or otherwise detected by the jury), the trial court may use the restraint at its discretion provided there is good reason for doing so. But as stated above, we do not have a finding regarding the visibility of the restraint and therefore remand for further consideration of that issue also.

### H. Cumulative Error

Appellant's final argument posits the existence of cumulative error. Because we reverse on other grounds, we need not address this argument.

### III. Conclusion

For the foregoing reasons, Appellant's conviction is reversed and this case is remanded to the trial court for further proceedings consistent with this opinion.

All sitting. MINTON, C.J.; ABRAMSON, CUNNINGHAM, and NOBLE, JJ., concur. SCHRODER, J., concurs in part and dissents in part by separate opinion in which VENTERS, J., joins.

SCHRODER, J., concurring in part and dissenting in part:

I concur in part and dissent in part because I disagree with the legal analysis regarding the hearsay statements repeated by the landlady, Vickie Wheeler.

The majority concludes that the statements made by Rapp and Sanchez to Wheeler were non-testimonial under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), because they were "informal," "not made to law enforcement or their equivalents," and "not obtained under interrogative circum-

stances." I disagree with the majority's test. Neither *Crawford,* nor *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), limited testimonial statements to those obtained by law enforcement or their agents. Nor is "formality" or an "interrogation" required for a statement to be testimonial. "The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation." *Davis,* 547 U.S. at 822, n. 1, 126 S.Ct. 2266. "[I]t is in the final analysis *the declarant's statements ...* that the Confrontation Clause requires us to evaluate." *Id.* (Emphasis added.)

The statements to Wheeler by the victim/witness Rapp recounted past criminal events. Pursuant to *Davis,* I believe the statements are testimonial. The in-court use of the statements was to establish the truth of the matter therein (that Rapp's home was broken into and that the intruder would not let him leave). Accordingly, I believe the use of the statements as proof of burglary and unlawful imprisonment implicates the Confrontation Clause.[7]

Although the alleged hearsay error as to the police officers was unpreserved, to avoid error on retrial, I believe it behooves the Court to address the statements made by Rapp to the police officers (that a man had come into his apartment, stated the police were looking for him, and that he needed a place to hide). It appears that under *Davis,* these statements would be considered non-testimonial, as they were made in the context of an ongoing emergency, with the police in hot pursuit of Appellant at the time. The issue then would become, whether the statements are admissible under any hearsay exception. *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354.

Venters, J., joins.

---

7. A similar analysis would apply to the statements made by Sanchez to Wheeler, however, because the count involving Sanchez was subsequently dismissed, the Sanchez hearsay issue appears to be moot.