Kevin SHEGOG, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2002–SC–0528–MR.

Supreme Court of Kentucky.

Aug. 26, 2004.

Richard Hoffman, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Elizabeth A. Heilman, Assistant Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice GRAVES.

Appellant, Kevin Shegog, was convicted in the Campbell Circuit Court of first-degree robbery and for being a first-degree persistent felony offender. He was sentenced to a total of twenty years imprisonment and appeals to this Court as a matter of right. Finding no error, we affirm.

Appellant's convictions stem from a robbery that was committed on May 28, 2001, at a BP gas station in Highland Heights, Kentucky. Joy Powell, a witness who was inside the gas station at the time of the

robbery, stated that she observed an African–American male wearing a red and white sports jacket and a nylon stocking on his head pass by the front glass window and then enter the store. Once inside, Powell stated that the man grabbed her and, as he pulled the stocking down over his face, announced that he had a gun. Powell was ordered behind the counter with the store clerk and both were told to lie on the floor. After taking the money from the register, the robber fled the scene. Powell's husband Steve, who had been pumping gas, observed the man get into a dark colored vehicle with a vanity license plate that read "Shegog."

The following day, Powell was shown a photo line-up, but was unable to identify the robber due to the poor quality of the computer-generated images. Police thereafter compiled a second line-up of color photographs, from which Powell identified Appellant. Appellant was indicted for and ultimately convicted of first-degree robbery. The jury recommended a fifteen year sentence enhanced to twenty years by virtue of Appellant's persistent felony offender status. Judgment was entered accordingly and this appeal ensued. Additional facts are set forth as necessary.

## I.

■ Appellant's first allegation of error concerns the trial court's failure to grant what Appellant characterizes as a "meaningful" hearing on his request for new counsel, resulting in his being forced to go to trial with unwanted counsel. After reviewing the record and the trial court's order, we conclude this argument lacks any merit.

Prior to Appellant's arraignment on the instant charges, he wrote a letter to the trial court expressing his dissatisfaction with his court-appointed counsel, Theodore Knoebber, and requesting the services of either public defender John Delaney or Steve Dowell. During the arraignment, the trial court denied the request for new appointed counsel. However, after Appellant filed a bar complaint against Knoebber, the trial court appointed Dowell as co-counsel.

Two weeks prior to trial, Appellant filed a letter with the circuit clerk complaining about Dowell's representation. Appellant also filed a bar complaint against Dowell. Then, five days prior to the April 24, 2002, trial date, Appellant filed a *pro se* motion for a continuance to hire private counsel, arguing that Dowell had a conflict of interest (the bar complaint) which prevented him from providing effective representation. Appellant further alleged, as he did in the bar complaint, that Dowell was not keeping him informed about the case, was not filing appropriate motions, was not conducting an adequate investigation, and had refused to permit him to testify at the suppression hearing.

While Appellant complains that it was not "meaningful", the trial court did, in fact, hold a hearing on the motion to continue. At that time, Appellant was afforded an opportunity to fully inform the trial court of the basis of his motion and present any supporting evidence. Thereafter, the trial court entered an order, which stated in pertinent part:

> The first motion was made by Defendant pro se, to once again continue this trial. He has now filed a bar complaint against Hon. Steven Dowell, as he did previously against Hon. Theodore Knoebber, alleging ineffective assistance of counsel. His contentions are refuted by the record and have no basis in the view of the undersigned. In further support of his Motion to continue, he indicated on the record that when his wife is released from jail, she will hire him a private attorney. He further stated that her

mother has had the money to do so all along but has been too busy to do so. . . .

The Defendant was indicted on September 27, 2001, over six months ago. He immediately filed a pro se Motion for a speedy trial. Thereafter, on October 22, 2001, he asked for leave to replace his public defender with his previous public defender from Kenton County, who he said would represent him in this county as well, and renewed his motion for a speedy trial. No such substitution took place, and the matter proceeded to Pretrial Conference on November 28, 2001. Various motions were set for hearing on December 17, 2001 and a jury trial was scheduled for March 12, 2002.

On December 17, 2001, after the Defendant had filed a bar complaint against Mr. Knoebber, Mr. Dowell was appointed co-counsel for the Defendant on or about December 17, 2001. This required the trial date to be changed until April 2, 2002. Certain pro se motions were withdrawn by Mr. Dowell, at that time with the concurrence of his client, and a motion to suppress was set for February 8, 2002. A suppression hearing was held, the parties briefed their positions, and the Court's order from that hearing was entered March 26, 2002. To accommodate a vacation schedule, again with the concurrence of the Defendant, the trial date was changed to April 24, 2002. The Court has now been advised that the Defendant has filed the second bar complaint against Mr. Dowell as well, leading to this pro se request to continue the trial again.

In view of all the above, unless private counsel enters an appearance for the Defendant prior to the scheduled trial date (at which time an actual attorney with their available schedule would be present), this matter will proceed to trial as scheduled on April 24, 2002, the Court being of the opinion that good representation is being provided for the Defendant. The pro se Motion to continue this trial is, therefore, overruled at this time.

■ In order to warrant a substitution of counsel during trial, "the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir.1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973). *See also United States v. Welty*, 674 F.2d 185, 188 (3d Cir.1982); *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir.1976); *United States v. Young*, 482 F.2d 993, 995 (5th Cir.1973). Appellant contends that once he filed the bar complaint against Dowell, an actual conflict of interest arose and, thus, the trial court's failure to fully inquire into the conflict and permit Appellant to obtain new counsel violated his rights under the Sixth Amendment to the United States Constitution and Section 11 of the Kentucky Constitution.

Importantly, the trial court did not deprive Appellant of the right to secure private counsel of his own choosing. *See Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). The trial court merely ruled that such counsel, if obtained, was required to enter an appearance prior to the scheduled trial date. Further, contrary to the Commonwealth's argument, this issue is not controlled by *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), since Appellant never asserted the desire to represent himself.

■ Nevertheless, we do not agree with Appellant that the filing of a bar complaint against a public defender automatically entitles a defendant to new counsel. If such

were the case, trial delays due to counsel substitutions would be endless. Indeed, as the trial court herein concluded, Appellant's assertion that he would have the money to hire private counsel was a tactical strategy to again delay the start of his trial. A defendant is not entitled to the dismissal of his counsel and the appointment of a substitute "except for adequate reasons or a clear abuse by counsel." *Fultz v. Commonwealth*, Ky., 398 S.W.2d 881 (1966). Here, there were none.

We are of the opinion, as was likely the trial court, that Appellant's claim that his family was going to retain private counsel was, at best, speculative. The trial court clearly determined that Dowell was providing good representation and that Appellant's allegations of ineffective assistance of counsel were refuted by the record. Indeed, it is virtually a universal complaint by all defendants that their counsel has not adequately kept them informed. Nevertheless, Appellant has failed to demonstrate in any way that he was prejudiced by Dowell's performance, and a review of the record belies the conclusion that different counsel would have performed better or achieved a different result. No error occurred.

## II.

■ Appellant next argues that the trial court erred in failing to suppress Powell's out-of-court and in-court identifications of him since the photographic line-up was not only unduly prejudicial, but was also lost by the police prior to trial. After a thorough review of the record, we conclude no reversible error occurred.

The day after the robbery, Powell was shown a photo line-up consisting of computer-generated images. Powell stated at that time she was unable to identify the robber due to the quality of the pictures. Police thereafter obtained an actual photograph of Appellant and compiled a second photo array. Powell initially told Detective Thomas that she still could not identify the robber. However, as Detective Thomas was getting into his car to leave the Powell residence, Powell stopped him and stated that she did, in fact, recognize Appellant from the second line-up, but that she was afraid to testify. Unfortunately, sometime after Powell's' identification, the second photo array was lost.

The parties dispute what photograph of Appellant was included in the second line-up. Appellant has attached to his brief a mug shot depicting Appellant holding a placard with his name, height, weight, and social security number. Although there is no evidence in the record of this photograph, Appellant alleges that it was used in the photo line-up. At the suppression hearing, Detective Thomas identified a different photograph of Appellant in which the placard and pertinent information is conspicuously absent. And it is this photograph that is referenced by the trial court in its order denying Appellant's suppression motion.

Unfortunately, Powell's testimony during the suppression hearing supports neither side. Powell stated that the photograph she identified from the second line-up looked like a mug shot with Appellant holding a black board with white letters. However, the only information Powell recalled seeing on the board was "Campbell County." Powell further testified as to the length of time she observed Appellant as he passed by the glass window of the gas station and entered the store. Interestingly, Powell stated that she actually recognized Appellant from the first line-up but did not want to say so due to the poor quality of the photographs.

In denying Appellant's motion to suppress, the trial court found that Powell "did have sufficient opportunity consistent

with *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), to make an in-court identification of Appellant." Contrary to Appellant's brief, however, the trial court did grant the defense motion to suppress Powell's pretrial identification of Appellant due to the missing photo array.

While Appellant theorizes that Powell's identification of him from the second photo line-up was solely the result of her husband seeing "Shegog" printed on the photo, no evidence of such is found in the record. A review of the suppression hearing reveals that defense counsel asked very few questions regarding Powell's identification, such as whether "Shegog" was, in fact, on the photograph she viewed or whether her husband aided her in her identification. As such, we conclude that Appellant's assertions on appeal are unfounded and unsupported by the record. Accordingly, we are of the opinion that based upon the evidence presented at the suppression hearing, the trial court did not err in permitting Powell's in-court identification.

### III.

■ Appellant contends that the trial court erred in allowing the Commonwealth to introduce ten still photographs made from the gas station's surveillance tape because the tape was destroyed by the police prior to trial. Following a suppression hearing, the trial court ruled that there was no evidence of bad faith on the part of the police in destroying the tape, and denied the suppression motion. However, the trial court did grant the defense a missing evidence instruction.

The robbery was recorded on the gas station's surveillance cameras. In cooperation with the BP headquarters, police made ten still photographs from the "best" of the 50–60 frames showing the robbery. Evidently, when police later attempted to make a copy of the tape for discovery purposes, a television soap opera was recorded over the surveillance images.

Appellant contends that the Commonwealth should not have been allowed to admit the ten photographs since (1) the defense had no input into choosing those photographs, and (2) the destruction of the tape prohibited the defense from admitting any other photographs. Appellant argues that the surveillance tape was critical to his case because it would have either supported or contradicted Powell's claim that she observed the robber without his face mask for several seconds after he entered the store. Since none of the ten photographs depicted the robber without the face mask, Appellant claims that Powell was mistaken about having observed the robber's face, or there should have been several images of him unmasked. Without the tape, the defense was unable to contradict Powell's testimony.

While Appellant maintains that he was prejudiced by the admission of the photographs, we are of the opinion that any error was harmless at best, especially in light of the missing evidence instruction. Although Appellant was prevented from introducing any other frames from the surveillance tape, *none that were introduced showed Appellant.* In other words, while Appellant could not necessarily contradict Powell's testimony with the surveillance tape, the still photos did nothing to bolster her testimony since they did not show any images of the robber without his face mask.

■ As the trial court found, Appellant offered no evidence that the surveillance tape was purposely erased. "Absent a showing of bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." *Kirk v. Commonwealth,*

Ky., 6 S.W.3d 823, 826 (1999), *citing Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

## IV.

■ Appellant next alleges that the trial court erred in failing to take sufficient precautions to prevent jurors from observing him in handcuffs. Specifically, several potential jurors allegedly viewed Appellant as he was being escorted from the jail into the courthouse. Prior to the start of voir dire, the following colloquy took place:

> Defense: Judge, I'm gonna make the same objection and motion that I do pretty much in every one of the cases I do over here. Kevin is the one that specifically asked me to do this as well.... He was in street clothes, but he was in handcuffs with the sheriff. And, you know, and I understand the court's position that it is a security issue, but we also believe it's a constitutional issue. We, we think that it really puts him in a bad light from the jump and at this point in time we would move to continue the trial or, or somehow maybe ask the court to voir dire the jurors concerning that issue whether or not it's gonna affect their ability to be fair. It, you know, it's the same problem that I personally, I have and every defendant that I've ever represented in Campbell County has, you know, being brought over from the jail....

> Comm: Judge, we would object to any continuance, but we have no problem if the court wants to inquire as to, voir dire the issue per their request as to whether that's going to affect somebody's (unintelligible).

> . . .

> Defense: You know, I don't personally, I don't want to call their attention to it either, but I don't know any other remedy other than to seek a continuance or may-, or maybe even just a continuance 'til tomorrow so we could bring in another portion of the panel and strike those that were outside, but that's Kevin's request.

> Court: By the time this jury, whoever it is, hears this case, at each break, at each luncheon, coming back in the next day, is going to realize that the Sheriff's office is taking your client back and forth to the jury room, back and forth to the jail. Right now, I understand his feelings on that. I wish we had a better logistic plan for the way things are done short of making sure you're here at 7:30 in the morning which I am here a lot of times. And even then, you get jurors waiting. They were sitting in their cars this morning when I came in real early. So, you can almost never avoid that at some point and the curative situation is simply that as the trial goes on there is a realization that, as a practical matter, that person is in custody. That's all it amounts to, that they are in custody and they are going to trial. And, and I don't believe there is an instruction that would do anything more than make it worse than our physical layout ....

> Defense: From a professional standpoint, I agree with you judge, but I have to do what Mr. Shegog ...

> Court: I understand that, you are making your record, it is so noted, and it's overruled.

It is clear from the above exchange that defense counsel withdrew, at least implicitly, his request that the trial court voir dire the potential jurors. Thus, the only question on appeal is whether the trial court erred in denying the motion for a continuance to bring in additional jurors. We conclude that it did not.

The decision whether or not to grant a continuance lies within the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. We have repeatedly held that the inadvertent viewing of the defendant in handcuffs for the sole purpose of being taken to or from the courtroom is not automatically reversible error. *Moss v. Commonwealth*, Ky., 949 S.W.2d 579 (1997); *Williams v. Commonwealth*, Ky., 474 S.W.2d 381 (1971). While the trial court denied the request to call additional jurors, defense counsel had the opportunity to voir dire the potential jurors to discover whether any of them had, in fact, observed Appellant. As such did not occur, we cannot conclude that Appellant was prejudiced. As reiterated in *Davis v. Commonwealth*, Ky., 899 S.W.2d 487, 491 (1995), *overruled on other grounds in Meriweather v. Commonwealth*, Ky., 99 S.W.3d 448 (2003), "it would be impossible as a practical matter to conduct a trial without the jury seeing some sign that the defendant [is] not entirely free to come and go as [he] please[s]." Clearly, the trial court expressed the same sentiment in denying the request for a continuance.

## V.

Appellant argues that he was entitled to a directed verdict on all charges since the Commonwealth produced no credible evidence connecting him to the robbery. Appellant contends that his conviction is based only upon an unreliable identification and evidence that a car bearing the same vanity license plate was involved in the crime.

When ruling on directed verdict motions, a trial court must assume evidence to be true, taking all evidence in the light most favorable to the Commonwealth, and leaving questions of weight and credibility to the jury. *Common-*

*wealth v. Benham*, Ky., 816 S.W.2d 186 (1991). Further, on appeal, "the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.* at 187. (*Citing Commonwealth v. Sawhill*, Ky., 660 S.W.2d 3 (1983)). In the case at bar, the Commonwealth produced more than a mere scintilla of evidence and therefore, there was no error on the part of the trial court in its ruling on this motion. The Commonwealth satisfied its burden to withstand a directed verdict.

## VI.

Appellant next argues that the Commonwealth failed to establish that he was armed with a gun and thus, his conviction for first-degree robbery was improper. We disagree.

Reference to a deadly weapon coupled with a contemporaneous demand for money is sufficient to withstand a motion for directed verdict on a charge of first-degree robbery. *Swain v. Commonwealth*, Ky., 887 S.W.2d 346 (1994). *See also Dillingham v. Commonwealth*, Ky., 995 S.W.2d 377 (1999), *cert. denied*, 528 U.S. 1166, 120 S.Ct. 1186, 145 L.Ed.2d 1092 (2000). The evidence at trial established that Appellant entered the gas station, grabbed Powell and stated that he had a gun. Further, Powell's husband testified that he observed the robber grab his wife with one hand while keeping the other hand in his pocket. In fact, Steve Powell stated that he was in the process of entering the store until he realized the robber was armed with a weapon.

Regardless of whether Appellant in fact was armed, "any object that is intended by its user to convince the victim that it is a pistol or other deadly weapon

and does so convince him is one." *Merritt v. Commonwealth*, Ky., 386 S.W.2d 727, 729 (1965). The jury was instructed on both first and second-degree robbery, and it found that the evidence supported the higher offense. Appellant was not entitled to a directed verdict on the first-degree robbery.

## VII.

■ Finally, Appellant argues that the trial court should have *sua sponte* granted a mistrial after it was discovered during the Commonwealth's voir dire that a potential witness was a member of the jury pool. Appellant concedes this issue is not preserved but urges review as palpable error under RCr 10.26. We find no error, palpable or otherwise.

One of the potential witnesses for the Commonwealth, Lieutenant Colonel Keith Hill of the Campbell County Police Department, was on the jury panel during the time period of Appellant's trial. During voir dire, the prosecutor told the jury:

There's one more witness that I expect you're going to hear from, and believe it or not, I've never had this happen, he's a juror. He'd be sitting here today with you if he weren't a witness in this case today. His name is Lieutenant Colonel Keith Hill, he's with the Campbell County Police department. I don't know if he's been at the other trials that you all have sat through voir dire on or not. I imagine he comes to court like he's supposed to, but he is not here today because he's a witness and I expect that he is going to testify. Do any of you now Keith Hill either outside of this or just in talking to him . . . .

Three potential jurors indicated they knew Officer Hill. One juror who had a niece that was married to Officer Hill was excused for cause after stating that she would decide the case in accordance with his testimony. A second juror was excused for cause after stating that her friendship with Officer Hill would affect her ability to be impartial. Finally, a third juror stated that she attended the same church as Hill, but claimed that such would not affect her impartiality. She was not excused for cause but was removed by a defense peremptory challenge.

Officer Hill ultimately did not testify. Nonetheless, Appellant now contends that the comments made by the three jurors who did not sit on the panel tainted the entire pool because they vouched for Officer Hill's credibility and conveyed the notion that "Officer Hill was a good churchgoing family man who had an impeccable reputation for his truthfulness." Appellant further notes that because Officer Hill did not testify the jury was left with the impression that he "would not be involved in a case that lacked merit."

Appellant cites no authority that requires a trial court to *sua sponte* order a mistrial under circumstances such as are presented here. Nor does Appellant demonstrate how any juror was influenced by his or her limited contact, if any at all, with Officer Hill through jury service. The only three potential jurors who expressed any association with Officer Hill did not sit on the jury.

■ Furthermore, we disagree that the three juror's responses to the Commonwealth's voir dire questions tainted the entire panel. "The principal purpose of voir dire is to probe each prospective juror's state of mind and to enable the trial judge to determine actual bias and to allow counsel to assess suspected bias or prejudice." Bertelsman & Philipps, *Kentucky Practice*, (Civil Rules) 4th Ed., Vol. 7, Rule 47.01(2) (1984). The voir dire process in the case worked exactly as it should have, and the two jurors who expressed bias

were removed for cause. While the third juror claimed impartiality, Appellant opted to remove her as well. The fact that Officer Hill was a member of the jury pool during the time of Appellant's trial did not automatically taint the entire pool, and certainly did not create a manifest necessity for a mistrial.

The judgment and sentence of the Campbell Circuit Court are affirmed.

All concur.