OPINION OF THE COURT BY CHIEF JUSTICE MINTON
*586 A circuit court jury convicted James Ellis Lang of first-degree robbery and fixed punishment for that crime at twenty years' imprisonment. Lang then pleaded guilty to the additional charge of being a first-degree persistent felony offender (PFO), and the same jury fixed an enhanced penalty of thirty years' imprisonment. Lang now appeals the resulting judgment as a matter of right,[1] raising three issues for our review.
We reject Lang's contention that the trial court erred by failing to dismiss the indictment for the Commonwealth's alleged violation of his right to a speedy trial. We accept Lang's contention that the trial court erred when it failed to direct a verdict on the first-degree robbery charge. Following our established precedent on this issue, we reverse the first-degree robbery conviction and sentence, vacate the PFO conviction and sentence, which is predicated upon the underlying first-degree robbery conviction, and remand the case to the trial court for further proceedings consistent with this opinion.[2]
Lang's third argument-that the trial court erred by preventing him from fulfilling his role as his own co-counsel by denying his request to make his own opening statement and closing argument to the jury at trial-is rendered moot by our reversal today. But because the issue is likely to arise in the event of a trial on remand, we direct the trial court to reconsider its ruling in light of our discussion of Lang's issue in this opinion.
I. ANALYSIS.
A. The trial court did not violate Lang's right to a speedy trial.
Lang argues that this Court should vacate the judgment and direct the trial court on remand to dismiss the indictment because his right to a speedy trial was violated by the protracted proceedings in this case. That this issue is preserved for appellate review is undisputed. We reject Lang's argument because the delay in this case is largely self-inflicted.
All criminal defendants have a constitutional right to a speedy trial.[3] "[A] defendant's right to a speedy trial is analyzed under the four-prong balancing test set forth in Barker v. Wingo[4] ."[5] "The four factors to be considered in a speedy trial analysis are: 1) length of the delay; 2) reason for the delay; 3) defendant's assertion *587 of his right to a speedy trial; and 4) prejudice to the defendant."[6]
1. Length of Delay
The Commonwealth concedes that the nearly 52-month delay between arraignment and trial in this case is presumptively prejudicial. "That prejudice, however, is not alone dispositive and must be balanced against the other factors."[7] " 'Presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the Barker enquiry."[8]
2. Reasons for Delay
The reasons for the delay in this case weigh heavily in favor of the Commonwealth. As the Commonwealth points out, the record supports the conclusion that nearly all the delays in this case were attributable to Lang and his pre-trial tactics.
Lang was arraigned on the first-degree robbery charge on October 2, 2012. His original trial date was set for June 18, 2013. That date, however, fell during a public defender's statewide conference, so Lang's appointed counsel asked for a continuance. At an October 1, 2013, hearing, Lang's counsel informed the trial court that Lang had recently discussed an issue with her that Lang wanted to raise pre-trial, agreeing to a continuance for that reason. A new trial date was set for May 20, 2014.
On February 6, 2014, when a pre-trial conference for the May trial date was held, Lang stated that he wanted to participate in trial as co-counsel. The court set a second pre-trial conference for March 25, 2014, to conduct the mandated Faretta hearing[9] and kept the May 20, 2014 trial date. Lang also requested an ex parte hearing regarding conflict counsel, which the trial court set for April 7, 2014.
The May 20, 2014 trial date was converted to a pre-trial conference because Lang filed a pro se motion asking for a continuance. Lang had also filed several other pro se motions with the trial court, including a motion to disqualify the entire Commonwealth's Attorney's office, a motion for an evidentiary hearing, a motion for an emergency protective order, a motion for additional discovery, and a motion for better access to legal materials in jail. The trial court then set a new pre-trial date and rescheduled the trial date for October 14, 2014.
By the time the next pre-trial conference occurred on August 7, 2014, Lang had filed more pro se motions, including a motion for additional discovery regarding disciplinary records for police detectives not connected to his case, a motion to hold the jail in contempt, a motion for an expert witness, a motion to "memorialize" his status as co-counsel, and a motion for bond reduction. As both parties concede, for reasons not apparent from the record, the October trial date was continued, and a new trial date was scheduled for June 9, 2015.
On June 5, 2015, the trial court, at Lang's request, held another ex parte hearing. At this hearing, Lang asked the trial court to appoint conflict counsel because his current appointed counsel had *588 not told him until the month before that she did not agree with his theory of the defense or think it was viable. Lang stated that he and appointed counsel were "not prepared to go to trial." Appointed counsel stated that she had, on multiple occasions, discussed with Lang his defense and her concerns regarding it. Appointed counsel was also concerned that a newly appointed attorney could not prepare for a trial just five days away at that point. Lastly, appointed counsel remarked that if she remained Lang's counsel, Lang's new concerns about her assistance would necessitate further discussions between them. Because of this hearing, the trial court set a new trial date.
On August 6, 2015, conflict counsel appeared with Lang for the first time. A pre-trial conference was set for November 12, 2015, and the new trial date was set for March 29, 2016. Lang filed a motion to have conflict counsel disqualified, which the trial court denied. On March 29, 2016, conflict counsel had the flu and asked for a continuance. A new trial date of June 21, 2016 was set.
At a pre-trial conference on May 9, 2016, the trial court addressed Lang's pro se motion requesting a special prosecutor handle his case. The trial date remained set for June 21, 2016.
Both parties agree that the June 21, 2016 trial was continued for reasons unclear on the record. On June 23, 2016, the Commonwealth requested a continuance because the back-up trial date in August conflicted with the case's lead detective's out-of-state training session.[10] The trial court then scheduled a new trial date of August 30, 2016. But, the trial court was in the middle of a civil trial and had to move Lang's trial date to January 24, 2017.[11]
On January 20, 2017, the trial court held a pre-trial hearing to address Lang's pro se motion to disqualify his second attorney, claiming that a conflict arose and that he wanted the court to assign him a different attorney. Nonetheless, the trial court proceeded with trial on January 24, 2017. We note that after Lang's trial began, he filed four more pro se motions.
3. Absence of Prejudice to Lang
It is undisputed that Lang asserted his right to a speedy trial on March 26, 2016. We note that such an assertion did not occur until about three and a half years after he was first arraigned.
Regarding the prejudice prong of the Barker analysis, we find it difficult to give credence to any prejudice asserted by Lang, himself a seasoned veteran of the criminal justice system, when almost the entirety of the delay in this case was largely attributable to Lang's self-directed pretrial practice. That finding weighs heavily in our holding that Lang's right to a speedy trial was not violated.
B. The trial court erred when it denied Lang's motion for a directed verdict on the first-degree robbery charge.
Lang argues that the trial court erred when it denied his motions for a directed verdict and a judgment notwithstanding the verdict on the first-degree robbery charge. Preservation of this issue is uncontested. We agree with Lang.
*589 "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal."[12]
Kentucky Revised Statutes ("KRS") 515.020(1) defines the elements of first-degree robbery:
A person is guilty of robbery in the first degree when, in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he:
(a) Causes physical injury to any person who is not a participant in the crime; or
(b) Is armed with a deadly weapon; or
(c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.
The facts of this case are practically undisputed. Lang walked into a bank. He approached one of the bank tellers, handing her a deposit slip. The slip said, "only 20s, 50s, and 100s, no wrappers." The teller testified at trial that she was confused by the note, so she looked up at Lang. The teller testified that Lang proceeded to "signal, that he had a gun, with his hands. It was like a trigger finger." The teller then gave Lang money. He took the money and left the bank.
During the teller's testimony, the Commonwealth introduced bank surveillance videos showing Lang at the bank from the time he walked up to the teller to the time he left. It is difficult to tell from any of the videos if Lang ever made a signal to the teller that he had a gun. In fact, at no point do any of the videos show Lang making such a gesture. But there is a point in one of the videos where Lang moves his hands, at which point the teller testified that Lang made the triggering gesture, although it is frankly impossible to tell from the video whether any signal was made.
Two other witnesses testified for the Commonwealth. One of the witnesses, the bank's branch manager, testified that he could not see what occurred at the teller station because Lang's back was to him. Another witness, a bank employee, testified that he saw the note passed but nothing more. What is undisputed is that Lang said nothing aloud to the teller, did not verbally threaten her or anyone at the bank, no one was physically harmed at the bank, and no one saw Lang in possession of a weapon or dangerous instrument.
As stated, the jury convicted Lang of first-degree robbery. The specific instructions the trial court gave to the jury, and under which the jury convicted Lang, are as follows:
You will find [Lang] guilty of Robbery in the First Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
A. That [the defendant] stole or attempted to steal money from [the teller]; AND
B. That in the course of doing so and with the intent to accomplish the theft, he used or threatened the immediate use of physical force upon [the victim] with a handgun; AND
C. That said handgun was a dangerous instrument ....
*590 It is clear from the instructions that the jury convicted Lang of first-degree robbery under KRS 515.020(1)(c), which the Commonwealth confirmed in its brief. Lang never caused physical injury to anyone, ruling out application of KRS 515.020(1)(a), and there was no evidence that Lang was armed, ruling out KRS 515.020(1)(b).
The question we must answer is "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt[ ]" under KRS 515.020(1)(c). If we answer this question in the affirmative, then we must find reversible error in Lang's case. To answer this question, we turn to our precedent.
We first turn to our decision in Gamble v. Commonwealth .[13] The facts of that case are as follows:
On February 7, 2007, a man later identified as Appellant Christopher Gamble walked into the Alexandria Drive branch of Chase Bank in Lexington with his head and face covered. Natalie Lindgren, an assistant manager, was working behind the teller window, and her manager Lynn Dowdy was standing nearby. Lindgren felt threatened by the man, and immediately pressed her silent alarm. Gamble walked to Lindgren's window, passing her a bag and a note that read, "This is a robbery. I have a gun. Quietly empty your drawer fast." Gamble also told Lindgren, "I have a gun." Lindgren testified that she believed Gamble had a gun, though she never saw one. Lindgren placed money, including "bait money," and a dye pack in the bag. As Gamble left, he told Lindgren, "You just saved your life." Gamble's hands remained in plain view the entire time, and, according to Lindgren, he never placed his hands in his pockets.[14]
The Court in Gamble began its analysis by distinguishing "much of our first-degree robbery caselaw" because it "primarily interprets subsection (b)" which had "little applicability to [Gamble's] case."[15] The Court noted that it "has rarely had occasion to discuss subsection (c)."[16] The Court then analyzed the facts of the case:
Turning to the instant case, drawing all fair and reasonable inferences in favor of the Commonwealth, Gamble entered Chase Bank, and handed Lindgren a note that said, "This is a robbery. I have a gun. Quietly empty your drawer fast." Gamble also verbally stated, "I have a gun" and told Lindgren after the robbery, "You just saved your life." Gamble specifically referenced a gun, threatened to use it, and implied that he would have used it had Lindgren not cooperated. Therefore, Gamble's statements amounted to threatening the immediate use of a gun.
The Court then discussed a case that Gamble cited in support of his argument, Williams v. Commonwealth[17] .[18] "In Williams, the defendant robbed a convenience store, pointed to some sort of unidentified bulge in his pocket, and cautioned to the clerk, 'Do you want your life?' The *591 clerk testified that he believed 'maybe he ... had a weapon or something.' "[19] The Gamble Court then noted what this Court held in Williams :"Without an instrument's ever being seen, an intimidating threat albeit coupled with a menacing gesture cannot suffice to meet the standard necessary for a first-degree robbery conviction."[20] The Gamble Court then went on to distinguish Williams :
Williams, however, is distinguishable from this case. First, it is not clear under which subsection of the first-degree robbery statute Williams was indicted.[21] More importantly, unlike Gamble, the defendant in Williams never specifically stated that he had a weapon or dangerous instrument of any sort. He simply pointed to a bulge in his pocket and asked, "Do you want your life?" By contrast, Gamble specifically stated that he had a gun, both in writing and verbally. This amounts to threatening the immediate use of a dangerous instrument. The defendant in Williams, by contrast, made only vague threats."[22]
The Court finally went on to uphold Gamble's conviction, finding that it was not clearly unreasonable for the jury to find Gamble guilty of first-degree robbery under KRS 515.020(1)(c).
That same month, this Court rendered its decision in Lawless v. Commonwealth .[23] We note the relevant facts:
The Commonwealth's proof included testimony by the bank teller whom Lawless confronted and by a customer at an adjacent teller station who witnessed that confrontation. Both witnesses testified that Lawless approached the teller with the hood of her black jacket over her head and across part of her face. They both testified that she kept her right hand in the jacket pocket and with her left hand passed a note to the teller. The note demanded that the teller "hand over all the money, fast and quiet with no dye packs." The teller testified that when she was not sure how to hand over the money, Lawless ordered her to "put it in a bag." The teller then put the money into the plastic bag lining her wastebasket and gave it to Lawless. The adjacent customer testified that when he saw the teller putting money into the wastebasket-liner he realized that she was being robbed.
...
Both the teller and the customer testified at trial that the fact that Lawless kept her right hand in her pocket made them think that she might have a gun. Indeed, the teller testified that that possibility terrified her and made her try to do nothing that would upset Lawless and the customer testified that not only did Lawless keep her hand in her pocket but that she made gestures as though she had a gun .... Neither the teller nor [sic] the customer, however, saw a gun, *592 any part of [a] gun, or any other implement for that matter.[24]
The Court in Lawless determined that "these facts do not justify a first-degree robbery finding under ... KRS 515.020... (c) and the trial court erred, therefore, when it refused to direct a verdict on that charge."[25]
Especially in accordance with Lawless, we are constrained to conclude that the trial court erred when it did not grant a directed verdict in favor of Lang on the first-degree robbery charge. The facts of Lawless mirror almost exactly what happened in Lang's case. As stated, the defendant in Lawless approached the teller, passed a note to the teller demanding money, and made gestures as though she had a gun.[26] Lang also approached the teller, passed a note to the teller demanding money, and the teller testified that Lang made one gesture suggesting to her that he had a gun. The defendant in Lawless arguably acted even more threateningly than Lang did. The Court found reversible error in the denial of a directed verdict motion in Lawless,[27] just as we do here.
When the Court in Gamble attempted to distinguish Williams, one of its distinguishing facts was that the defendant in Williams "never specifically stated that he had a weapon or dangerous instrument of any sort. He simply pointed to a bulge in his pocket and asked, 'Do you want your life?' "[28] "By contrast, Gamble specifically stated that he had a gun, both in writing and verbally."[29] "The defendant in Williams, by contrast, made only vague threats."[30]
Here, the only "threat" that Lang allegedly made was a triggering movement with his finger, which is actually less than the totality of "threats" the defendant in Williams made, a case in which this Court reversed the defendant's conviction.[31] Additionally, the circumstances of this case are remarkably different from those in Gamble, where the defendant told the teller, both in writing and verbally, that he had a gun.[32] No such statement was made by Lang, only the finger movement. And we ruled in Lawless that a simple gesture is insufficient to warrant a first-degree robbery conviction under KRS 515.020(1)(c).[33]
The Commonwealth points to this Court's decision in Shegog v. Commonwealth, where we stated, "reference to a deadly weapon coupled with a contemporaneous demand for money is sufficient to withstand a motion for directed verdict on a charge of first-degree robbery."[34] But that statement was made in a case involving remarkably different factual circumstances:
The evidence at trial established that Appellant entered the gas station, grabbed [a victim] and stated that he had a gun. Further, [the victim's] husband testified that he observed the robber grab his wife with one hand while keeping the other hand in his pocket. In *593 fact, [the husband] stated that he was in the process of entering the store until he realized the robber was armed with a weapon.[35]
Nothing of this sort occurred in the case at hand.
Based on the peculiar facts of this case in relation to our precedent, we are constrained to hold that the trial court should have granted a directed verdict in Lang's favor on the first-degree robbery charge. We therefore reverse Lang's first-degree robbery conviction and underlying sentence and vacate the PFO conviction and enhanced sentence.
C. The trial court should have conducted further review of Lang's request to make opening and closing statements himself.
Lang, who acted as his own co-counsel at trial and beginning in the early pretrial stages of this case and who, according to the Brief for the Appellant, made "[n]inety-nine percent of the motions filed in this case," alleges that the trial court violated his constitutional right to represent himself at trial by denying his motions to conduct opening statement and closing argument himself. Preservation of this issue for appellate review is undisputed, and we will review despite our reversal on other grounds because it is likely to arise in the event of a trial on remand.
"The Sixth Amendment of the United States Constitution and Section 11 of the Kentucky Constitution afford a criminal defendant ... the right of self-representation."[36] " Section 11 of the Kentucky Constitution also guarantees the right to hybrid representation."[37] "The pro se defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial."[38]
But in granting criminal defendants the right to act on their own behalf at trial, the U. S. Supreme Court succinctly addressed the relationship between the criminal defendant's constitutional right of self-representation and the trial court's "inherent authority to impose measures necessary for an orderly trial"[39] : "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law."[40] "Accordingly, trial courts may place certain restrictions on a defendant's right to self-representation."[41]
In this case, the trial court denied Lang's motions for the express reason that it feared Lang would use these two stages of the trial as an opportunity to testify about his case without being under oath and without being subject to cross-examination. In response to this denial, Lang offered to write out his closing argument before commencement of the trial for the trial court to evaluate beforehand, but the trial court rejected this offer. There is no *594 evidence in the record or allegation made by the Commonwealth that there existed other facts supporting the trial court's decision to curtail Lang's full exercise of his constitutional right of self-representation.
The trial court's fear that the jury would use statements Lang made in his opening statement and closing argument as evidence in this case is understandable but not, in our view, irrefutably dispositive of Lang's argument that he was constitutionally entitled to try his own case.
It is axiomatic in our jurisprudence that "[o]pening and closing statements are not evidence ...."[42] "[W]hat is said in opening statement is not evidence."[43] "A closing argument ... is not a vehicle for introducing evidence ...."[44] And the trial court could cure any defect arising out of Lang's pro se opening statement and closing argument with an admonition to the jury: "[A]ny statements made by the defendant while not on the stand[,] [ ]including the defendant's opening statement and closing argument[ ][,] are not made under oath, and should not be considered evidence in the case."[45] "We have long held that an admonition is usually sufficient to cure an erroneous admission of evidence, and there is a presumption that the jury will heed such an admonition."[46] Additionally, the trial court could have cured any potential defect by allowing Lang to write out his opening and closing statements before trial and reviewing them, editing them for inappropriate and inadmissible content.
From our review of the record, we find no risk of an "abuse [to] the dignity of the courtroom," nor a violation of "relevant rules of procedural and substantive law," when the admonition we have suggested is given by the trial court to the jury and pending the trial court's review of Lang's pre-written opening and closing statements. But we acknowledge that the presence of other or additional facts showing such abuse or violation in this case may have favored the trial court's decision. If this issue arises on remand, we are confident that the trial court will adequately explore this issue and articulate the factual basis for its ruling.
II. CONCLUSION.
We hold that our precedent mandates that we reverse Lang's first-degree robbery conviction and sentence and vacate his first-degree persistent felony offender conviction and sentence and remand the case to the trial court for further proceedings in accordance with this opinion.
All sitting. Minton, C.J., Cunningham, Hughes, and Venters, JJ., concur. VanMeter, J., dissents by separate opinion in which Keller and Wright, JJ., join.
I respectfully dissent from so much of the majority opinion as holds that the trial court erred in denying Lang's motions for a directed verdict and judgment notwithstanding the verdict on the first-degree *595 robbery charge. The teller testified that Lang made a gesture, a "signal, that he had a gun, with his hands. It was like a trigger finger." This testimony brought this case within this Court's precedent that a defendant's representation that he has a gun is sufficient to support first-degree robbery. See Gamble v. Commonwealth, 319 S.W.3d 375, 379 (Ky. 2010). In my view, such a representation may be made verbally, in writing, or by a commonly understood hand gesture. I would affirm the Jefferson Circuit Court's judgment in all respects.
Keller and Wright, JJ., join.

Ky. Const. § 110 (2)(b).

We note that the double jeopardy clause prohibits the Commonwealth from pursuing a first-degree robbery conviction on remand. See McGinnis v. Wine, 959 S.W.2d 437, 438 (Ky. 1998) ("[T]he double jeopardy clause precludes retrial 'once the reviewing court has found the evidence legally insufficient' to support the conviction.") (quoting Burks v. U.S., 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ). However, the Double Jeopardy Clause "does not prohibit a retrial for a lesser included offense." 8 Ky. Prac. Crim. Prac. & Proc. § 14:13 (5th ed., Dec. 2017 update) (citing McGinnis, 959 S.W.2d at 439 ("[T]he concept of acquittal by implication climbs up the ladder, not down.") ).

See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial ..."); Ky. Const. § 11 ("In all criminal prosecutions the accused ... shall have a speedy ... trial ....").

407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

Miller v. Commonwealth, 283 S.W.3d 690, 699 (Ky. 2009).

Id. at 699-700 (citing Barker, 407 U.S. at 530, 92 S.Ct. 2182 ).

Parker v. Commonwealth, 241 S.W.3d 805, 812 (Ky. 2007).

Miller, 283 S.W.3d at 700 (quoting Doggett v. United States, 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) ).

Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

"[A] valid reason for delay, such as a missing witness, will not be weighed against the Commonwealth, as valid reasons for delay are appropriately justified." Goncalves v. Commonwealth, 404 S.W.3d 180, 200 (Ky. 2013).

"Neutral reasons for delay, such as ... an overcrowded docket, will be weighed less heavily against the Commonwealth, but will nonetheless tip in the defendant's favor." Id.

Commonwealth v. Benham, 816 S.W.2d 186, 187 (Ky. 1991) (citing Commonwealth v. Sawhill, 660 S.W.2d 3 (Ky. 1983) ).

319 S.W.3d 375 (Ky. 2010).

Id. at 376.

Id. at 378. The Court cited several cases that it was distinguishing: Wilburn v. Commonwealth, 312 S.W.3d 321 (Ky. 2010) ; Shegog v. Commonwealth, 142 S.W.3d 101 (Ky. 2004) ; Dillingham v. Commonwealth, 995 S.W.2d 377 (Ky. 1999) ; Swain v. Commonwealth, 887 S.W.2d 346 (Ky. 1994) ; Kennedy v. Commonwealth, 544 S.W.2d 219 (Ky. 1976).

Gamble, 319 S.W.3d at 378.

721 S.W.2d 710 (Ky. 1986).

Gamble, 319 S.W.3d at 379.

Id. (citing Williams, 721 S.W.2d at 710-11 ).

Gamble, 319 S.W.3d at 379 (quoting Williams, 721 S.W.2d at 712 ).

The Gamble Court noted the following: "The opinion refers to 'first-degree (armed) robbery,' and noted that '[t]he indictment specified that Mr. Williams committed the robbery while armed.' This suggests that Williams was indicted under KRS 515.020(1)(b). However, Williams also objected to a definition of 'dangerous instrument' in the jury instructions, which suggests that he may have been indicted under KRS 515.020(1)(c) as well." Gamble, 319 S.W.3d at 379 n.14 (citing Williams, 721 S.W.2d at 711-13 ).

Gamble, 319 S.W.3d at 379.

323 S.W.3d 676 (Ky. 2010).

Id. at 677-78.

Id. at 680.

Id. at 677-78.

Id. at 680.

Gamble, 319 S.W.3d at 379.

Id.

Id.

Williams, 721 S.W.2d at 711-13.

Id. at 376.

Lawless, 323 S.W.3d at 679-80.

142 S.W.3d 101, 109 (Ky. 2004).

Id.

Allen v. Commonwealth, 410 S.W.3d 125, 133 (Ky. 2013).

Id. (citing Deno v. Commonwealth, 177 S.W.3d 753, 757 (Ky. 2005) ).

McKaskle v. Wiggins, 465 U.S. 168, 174, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

Nunn v. Commonwealth, 461 S.W.3d 741, 749-50 (Ky. 2015).

Faretta v. California, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Allen, 410 S.W.3d at 134.

Sneed v. Burress, 500 S.W.3d 791, 795 (Ky. 2016) (quoting Wheeler v. Commonwealth, 121 S.W.3d 173, 180 (Ky. 2003) ).

Jefferson v. Eggemeyer, 516 S.W.3d 325, 338 (Ky. 2017) (citing Wheeler, 121 S.W.3d at 180 ).

Walker v. Commonwealth, 288 S.W.3d 729, 741 (Ky. 2009).

Sharon Finegan, Pro Se Criminal Trials and the Merging of Inquisitorial and Adversarial Systems of Justice, 58 Cath. U. L. Rev. 445 (2009).

Matthews v. Commonwealth, 163 S.W.3d 11, 17 (Ky. 2005).